<pre>
 1              IN THE UNITED STATES DISTRICT COURT
                 WESTERN DISTRICT OF MISSOURI
 2                      WESTERN DIVISION

 3
   UNITED STATES OF AMERICA,          )
 4                                     )
                        Plaintiff,    ) Case No.
 5          vs.                        ) 17-00326-01-CR-W-SRB
                                       )
 6  DAVID R. BUIE,                     )
                                       )
 7                      Defendant.     )

 8

 9
                 JURY TRIAL – VOLUME I OF II
10       BEFORE THE HONORABLE STEPHEN R. BOUGH
                 MONDAY, MAY 7, 2018
11                KANSAS CITY, MISSOURI

12

13                      APPEARANCES

14  For the Plaintiff:        MS. TERESA A. MOORE
                              United States Attorney's Office
15                            400 East Ninth Street, Suite 5510
                              Kansas City, Missouri 64106
16
    For the Defendant:        MR. JOHN P. O'CONNOR
17                            Wagstaff & Cartmell
                              4740 Grand Avenue, Suite 300
18                            Kansas City, Missouri 64112

19

20

21

22           Gayle M. Wambolt, RMR, CRR
           U.S. Court Reporter, Room 7552
23        Charles Evans Whittaker Courthouse
                400 East Ninth Street
24        Kansas City, MO 64106 (816) 512-5641

25
                         1
</pre>

1                    I N D E X

2              MONDAY, MAY 7, 2018
3                VOLUME I OF II                        Page

4    Proceedings in Courtroom                            5

5    Instructions Read                                  26

6    Government's Opening Statement                      26

7    DEBBIE ATWOOD

8            Direct Examination                         33

9    MITCHELL S. ATWOOD

10           Direct Examination                         57

11   GERALDINE HAILE

12           Direct Examination                         61

13   JOSEPH MILLER

14           Direct Examination                         66

15   SANDRA HILLE

16           Direct Examination                         74

17   DAVID ALBERS

18           Direct Examination                         81

19   Proceedings in Courtroom                           92

20

21

22

23

24

25
                            2

```
 1                      I N D E X

 2                TUESDAY, MAY 8, 2018
                     VOLUME II OF II
 3                                                      Page

 4   Instruction Conference                            102

 5   ANDREW ALVEY

 6           Direct Examination                        103
             Cross-examination                         106
 7

 8   Instructions Read                                 117

 9   Government's Opening Argument                      117

10   Defense Closing Argument                          125

11   Government's Closing Argument                      136

12   Question by Jury                                   139

13   Verdict                                            141

14   Reporter's Certificate                             143

15

16

17

18

19

20

21

22

23

24

25                          3
```

INDEX OF EXHIBITS

| Exhibit No. | Description | Offered | Received in Evidence |
|---|---|---|---|
| Plaintiff's 3A | Printed Pages | 89 | 89 |
| Plaintiff's 4 | Photograph | 36 | 37 |
| Plaintiff's 5 | Photograph | 36 | 37 |
| Plaintiff's 6 | Photograph | 36 | 37 |
| Plaintiff's 7 | Photograph | 36 | 37 |
| Plaintiff's 10 | Photograph | 36 | 37 |
| Plaintiff's 11 | Photograph | 36 | 37 |
| Plaintiff's 12 | Photograph | 36 | 37 |
| Plaintiff's 13 | Floorplan | 36 | 37 |
| Defendant's 1 | Books | 106 | 106 |
| Defendant's 2 | Books | 106 | 106 |
| Defendant's 3 | Books | 106 | 106 |
| Defendant's 4 | Books | 106 | 106 |
| Defendant's 5 | Books | 106 | 106 |

Gayle M. Wambolt, CCR No. 462
Registered Merit Reporter

MONDAY, MAY 7, 2018

2                   (The following proceedings were had out of the

3       presence of the jury:)

4                   THE COURT:  Good morning, everyone.

5                   MS. MOORE:  Good morning.

6                   MR. O'CONNOR:  Morning, Judge.

7                   THE COURT:  I understand you've got a motion and an

8       offer of proof.

9                   MS. MOORE:  That's correct, Your Honor.

10                  THE COURT:  Pretty quick offer of proof?

11                  MS. MOORE:  Yes, uh-huh.

12                  THE COURT:  Okay.

13                  MS. MOORE:  If I may proceed.

14                  THE COURT:  You may.  He or she's just welcome to

15      sit there.

16                  MS. MOORE:  Thank you, Your Honor.

17                  Based on the 404(b) ruling from the court that we

18      received on Friday, the --

19                  THE COURT:  Well, maybe let's do this a little out

20      of order then.  Let me tell you my thought process behind my

21      order which will relate to your motion which may relate to the

22      offer of proof which may relate to the evidence that

23      Mr. O'Connor's seeking to be admitted.

24                  My thought is that after viewing the evidence or a

25      portion of the evidence, that this is a pretty close call.

                                    5

The jury's going to be able to listen to both arguments and

decide under the standards whether this was obscene or not.

What I don't want this decision to be is based upon a lot of

gruesome things in this guy's history that would, you know, as

soon as you hear that he's convicted for possessing child

pornography or looking at some of the things that are -- some

of the things he admitted that he's having difficulty not

being attracted to minor children, that that seems -- would

seem to automatically prejudice a jury in my mind, that any

probative value to it would be outweighed by the prejudicial

value.

        And so I really wanted this to kind of be a clean

trial on these facts alone.  So Mr. O'Connor's desire to use

community standards or comparable stuff by an investigator is

off that thought process, and the other things that you're

about to talk to are off that thought process as well.  I

wanted to make sure I was clear about what I was doing here

and what my hope for this trial would be so that at least you

know.

        And I don't know if Mr. O'Connor wants to open up

the door.  At least it's opening up the door in my mind that

if we get into a whole bunch of other stuff, that this isn't

-- this is beyond just the facts of this case where we're

looking at comparable evidence.  Maybe that opens up the door

that we start looking at other stuff because the case law that

6

1    you provided around the circuit, Ms. Moore, there's lots of

2    circuits that have approved allowing in prior pattern of

3    practice evidence to show that, hey, the fact that you were

4    convicted for child pornography or that you admitted that you

5    were attracted to minor females, that's been allowed in.  That

6    type of evidence has been allowed in.

7            So at least in my mind, Mr. O'Connor, starting to

8    bring in other evidence outside of the facts in this case gets

9    away from my 404(b) ruling.  At least it's my thought process

10   behind it, which could be straight down the middle.  So that

11   was my little speech, more of an explanation, about why I came

12   to what I did to figure out before you go into whatever where

13   we're at.  So both of you look like you're ready to say

14   something profound.

15           MR. O'CONNOR:  Go ahead, Teresa.

16           MS. MOORE:  Well, Your Honor, I -- related to the

17   ruling, the court indicated the defendant's prior conviction

18   may be admissible if it can be shown that the prior conviction

19   involved anime or animated cartoons.

20           THE COURT:  And the reason I put that in there,

21   again, and I've got this honesty problem, when I looked up

22   stuff on Mr. Buie, it appears that there was some issue of

23   anime in the past, but I couldn't figure that out by looking

24   at prior pleas.

25           MS. MOORE:  So what I have this morning -- his prior

7

conviction, he pled to a one-count information.  It was an

agreed-upon plea agreement.  I do have, and I've provided this

information to Mr. O'Connor, is that his plea agreement that

he pled to did indicate in the factual basis section of the

plea agreement, the technician, and I'm quoting from the plea

agreement and I'll present it to the court, the technician

found images of what he believed to be adult and child

pornography as well as animated illustrations of child

pornography.  And that's on page 2 of the signed plea

agreement in Case No. 10-00090.  And that's the prior

conviction.

            In addition to that, the presentence investigation,

and, again, these facts were not objected to in that prior

conviction, on -- in paragraph 4 of the presentence

investigation indicated basically the same thing.  The

technician found images of what he believed to be adult

pornography, child pornography, and animated illustrations of

child pornography.  I think sometimes -- and if I may approach

with both these court documents --

            THE COURT:  Thank you, ma'am.

            MS. MOORE:  Thank you.

            So I guess my point is I think sometimes child

obscenity or obscene visual representation of children

engaging in sexually explicit conduct or animated child

pornography, technically we're talking about something that

8

1   isn't photographs or images of actual children but are

2   drawings, cartoons, something of that nature kind of using a

3   different variety of terms.

4           Based on the defendant's prior plea --

5           THE COURT:  Which was the paragraph under the plea

6   agreement you wanted me to see?

7           MS. MOORE:  It was paragraph 3 and it's on page 2.

8           THE COURT:  Okay.  Go ahead.

9           MS. MOORE:  So I think that the government can show

10  based on these court documents that in fact the defendant's

11  prior conviction did involve animated images of children

12  engaged in sexually explicit conduct, and Detective Kim

13  Shirley-Williams, who's also a task force officer with the

14  FBI, was actually the investigator who investigated that prior

15  case.

16          And she can testify that from her recollection of

17  the case and the investigation, there were images of what she

18  would describe as incest between an adult and a child engaging

19  in sexually explicit conduct and also some Japanese anime

20  images of children engaged in sexually explicit conduct.  So

21  understanding that the conviction itself was to a one-count

22  information, the case did involve similar conduct as this

23  case.

24          So based on the court's ruling that considered the

25  prior conviction may be admissible if there was -- it involved

9

1  any anime or animated cartoons, the government would offer

2  that proof to the court, and if you want to hear from

3  Detective Shirley-Williams --

4          THE COURT:  I don't need to hear from her.  You're

5  welcome if you think it's needed for a record to put it on.

6  Let's see what Mr. O'Connor says.

7          MR. O'CONNOR:  Judge, I'd stipulate.  I know

8  Kimberly Williams.  She would testify to the facts that

9  Ms. Moore's alluded to.  I would just say at the time of the

10 plea, the plea was possession of child pornography.  There was

11 no judicial determination of whether or not obscenity existed

12 at the time, and it may have been part of what was recovered,

13 but it was not what the defendant pled guilty to.  I think the

14 court's ruling has addressed that.

15         THE COURT:  It kind of brings up a bigger question

16 in my mind as I'm plowing through these jury instructions and

17 getting ready.  You said, Mr. O'Connor, that he pled guilty to

18 possessing child pornography.  I'm assuming that this is --

19 he's charged with the crime of possession of child obscenity.

20         MR. O'CONNOR:  Correct.

21         THE COURT:  Is there really a -- are we just calling

22 it two different things?  Is child pornography and child

23 obscenity two different things, or are they really the same

24 thing?

25         MS. MOORE:  Your Honor, they are two different

10

statutes.  Possession of child pornography is -- typically we

charge it under 18 United States Code 2252(a)(4), and child

pornography is essentially visual depictions of actual minors

engaged in sexually explicit conduct.

THE COURT:  But the statute for child obscenity says

shall be a violation of 2252A, right?

MS. MOORE:  The punishment is the same as 2252A.

Actually 2252 -- it's B, I think, 2.  The punishment would be

the same including the punishment for someone who has a prior

conviction for one of the --

THE COURT:  So at least in the government's mind,

they're two different criminal statutes --

MS. MOORE:  Right.  The 1456A, child obscenity or

visual depictions, I think there's different terms you can

even use, includes the cartoons, the drawings, anime,

sculptures, paintings.  So they are two different statutes

under two different chapters.

THE COURT:  Do you agree with that, Mr. O'Connor?

MR. O'CONNOR:  I do.

THE COURT:  And so your argument to continue to keep

out this evidence is that, despite when I said that if the

prior conviction may be admissible if it involves child

animation, that he only pled guilty to possessing child

pornography?

MR. O'CONNOR:  And I would argue they had the choice

11

1     at the time to file the other charge and they did not.

2                THE COURT:  You feel like -- I'm pondering up here.

3     Do you feel you need to get anything additional out of the

4     officer other than what you've said?  Is there something --

5                MS. MOORE:  The only thing -- other point I would

6     add is that the plea agreement references a technician who

7     found images of child obscenity, and I think the same thing is

8     referenced in the presentence investigation.  Detective Kim

9     Shirley-Williams would also testify that there were some

10    actual physical printed documents that were received from a

11    family member purporting to be -- they were in a folder with

12    Mr. Buie's other information that was child obscenity that was

13    printed.  And do you have any recollection of how many items?

14    She does not recall the exact number of printed documents.

15               THE COURT:  And is -- would it be your intention

16    that Officer Williams would go on the stand just to testify

17    that this occurred?

18               MS. MOORE:  That's correct.  That's correct, Your

19    Honor, that -- based on the plea agreement.  The government

20    would essentially offer the plea agreement and at least a

21    portion of the presentence investigation pursuant to either

22    901 Rule of Evidence or 902, and then also ask Detective

23    Shirley-Williams if during the course of the prior

24    investigation, they discovered child obscenity issues or --

25    depictions and essentially that involved a child with an adult

                                     12

1  purported to be a parent having sexual contact and then the

2  Japanese anime images.

3          THE COURT:  Is there anything in this case that -- a

4  couple of times now you've brought up incest.  Is there

5  anything about this anime that makes --

6          MS. MOORE:  The -- I would say the entire items

7  possessed referenced sex between particularly boys and their

8  mothers.

9          THE COURT:  So that -- the part I saw last week at

10 the pretrial conference, as you know, I just briefly looked at

11 it, that in your mind would be a mother and her son?

12         MS. MOORE:  Right.  And in fact there's -- all of

13 the -- all of the images contained -- they're like comic

14 books, colored comic books, and they all talk about -- the

15 kids call the parent mom.  For instance, on the first page,

16 the dad is laying, like, passed out next to the couch, and the

17 little boy is saying, he's -- it's small.  Something about to

18 get up, let it go, mom, and the mom says -- or the woman

19 purported to be the mom -- You're a coward.  But all of the --

20 all of the cartoons, the younger person represents that the

21 person they're having sex with they call them mom.

22         THE COURT:  Okay.  Mr. O'Connor, I kind of get the

23 feeling that your angle on this trial is that under the jury

24 instructions, either that they didn't depict minors or they

25 weren't obscene.

                            13

```
 1              MR. O'CONNOR:  That they did not depict minors.  I

 2      don't think there's probably any question that they're

 3      obscene.

 4              THE COURT:  You're just going to say this individual

 5      in this comic strip is not a minor?

 6              MR. O'CONNOR:  Correct.

 7              THE COURT:  And --

 8              MR. O'CONNOR:  It's arguable whether they are.

 9              THE COURT:  You're going to argue it.  And you're

10      just going to admit obscene?

11              MR. O'CONNOR:  Yes.

12              THE COURT:  And I guess that's where the incest

13      plays in is obscenity.

14              MR. O'CONNOR:  Correct.

15              THE COURT:  You want to tell me anything about the

16      comparable evidence?

17              MR. O'CONNOR:  Judge, I don't think -- I mean, I

18      understand the argument about the comparable evidence, but I'm

19      not making -- my sole argument is -- goes to the element of --

20      there's six elements in this charge, and the element that the

21      visual depictions depict minors engaging in sex, that's why I

22      take -- I think if I try to get into five, that may open the

23      door on the other stuff, but whether or not the visual

24      depiction depicted minors, that I believe that whether they

25      depicted minors engaged in sexually explicit conduct, that's
```
                                    14

why I have these other magazines I was going to ask the court
to look at this morning.

I just -- my sole argument is whether or not these
are minors or whether it is really adult pornography packaged
to look like minors engaged in sex.  And so if you can walk
into a bookstore and buy similar material, then that is a -- I
think the jury should be able to know that without just
looking at a picture and trying to make a determination.
That's further evidence at least from these photographs I'm
going to ask you to look at.  So I'm keying in totally on the
fact that these are not minors involved in sexual activity.

THE COURT:  Well, let's see them.  Do you have them?

MR. O'CONNOR:  Yes.  They're right here.  I didn't
-- I was going to have you mark them, but I can show them to
you and mark them.  I've kind of put stickies on the ones that
I believe may -- so the question is whether or not that person
depicted is a minor or not under the law.

THE COURT:  So your investigator went to an adult
bookstore and purchased comic books?

MR. O'CONNOR:  And, so, Judge, so you know, those
were in a package.  They're sealed.  You can only see what's
on the outside.  You have to buy it.  Then you cut it open,
and then you see what's inside.

THE COURT:  And, I mean -- and so, like, the one
entitled "Super Sexxx" with three Xs -- have you seen these?

15

```
 1          MS. MOORE:  I have, Your Honor, yes.

 2          THE COURT:  -- that depict an adult women in a

 3   treehouse with kids at the base of the treehouse on -- by a

 4   bicycle, and the only captioned words on the front say, "What

 5   do you mean, no boys allowed?"  And there's play dolls and

 6   what appears to be an adult woman basically undressed.  You've

 7   got some sticky notes around.

 8          MR. O'CONNOR:  That's the ones I put on that I would

 9   argue that you cannot tell the age of the individual, whether

10   they're 18 or less.  Therefore, the photographs that they have

11   in trying to determine whether someone's 18, I mean, that's

12   what the bottom line is, is do they depict individuals under

13   the age of 18?  And I would argue that you can look at those

14   photographs, the ones I've marked, and say that that person

15   appears to be under the age of 18.  It's a jury determination.

16          THE COURT:  Right.  I mean, this could be -- just as

17   easily be possession of the child obscenity as well, right?

18          MR. O'CONNOR:  I guess it could be.

19          THE COURT:  It's being sold and the U.S. Attorney

20   hasn't known about it yet, and you could only find it at one

21   store.

22          MR. O'CONNOR:  Right.

23          THE COURT:  My concern about it if I let you make

24   that argument, I'm in essence saying that this is legal.

25          MR. O'CONNOR:  I guess what I'm saying is if you can
```
                                  16

purchase it legally, right now you can walk into a store and
purchase it legally in an adult bookstore, then how can it be
illegal or child pornography?  But I understand what you're
saying is it's by whose standards of which that's judged.

THE COURT:  Right.

MR. O'CONNOR:  I think it's relevant to the fact
that some of my client's -- his search engines were "barely
legal."  There's obviously stuff out there that would appear
by appearance, because that's what they're going to be
arguing, the appearance of someone to be less than the age of
18.  So I believe that it could be argued that there are
people that appear to be less than 18 --

THE COURT:  I hope this one goes to the Supreme
Court.  I hope I make enough controversial rulings that the
Eighth Circuit can do whatever.  You guys can take this to the
Supreme Court because "barely legal" to me is repulsive.

MR. O'CONNOR:  Correct.

THE COURT:  I mean, the hard part for me is I've got
a 19-year-old daughter.  So sitting here having this debate
is, you know, for the most part disgusting and -- you can mark
any of those that you want for -- because I'm not going to let
you use them because I'm not going to put the stamp of this
court that that is legal when if I think I had to decide if
that was a visual depiction -- or element number two is that
the visual depictions depict minors engaging in sexually

17

explicit conduct.

The comparable that you -- or lack of comparable that you gave me, to me is a visual depiction of minors engaging in sexually explicit conduct.  You can't put a little kid by the base of a treehouse with a bicycle and do anything in my mind but conjure up images of minors.

MR. O'CONNOR:  And that's my point is I think the argument we're going to make at the end of this is this statute is unconstitutional.  It's vague, it's overbroad.  You don't know what it really addresses someone's conduct.

So someone today can walk into a store and buy that and be subject to being -- sitting here before you; so that's why I think that this statute is -- and we'll argue that later at the end of the case.  But it's --

THE COURT:  Scalia has already passed away, God rest his soul, and so we'll see if Gorsuch picks up his mantle or not on that one.

MR. O'CONNOR:  Judge, in the morning before we close, if I could make an offer of proof.  I've got an FBI agent.

THE COURT:  I imagine he's a prior FBI agent.

MR. O'CONNOR:  Prior FBI agent.  I would like to make an offer of proof so that we can preserve that.  Other than that, I don't have anything else.

THE COURT:  Okay.  I'll keep pondering your evidence

18

1  on the prior convictions and other incidents that I ruled upon

2  in my Order No. 31 and look more closely at the plea agreement

3  and the PSI.

4          MR. O'CONNOR:  Judge, I would have basically three

5  further arguments to that before we get going.  I would argue,

6  one, Ms. Williams is not an endorsed witness.  Two, there's no

7  endorsed experts; so I believe she would be giving expert

8  testimony.  Three, the prior obscenity, if it was, was never

9  judicially determined; and so I would want the court to see

10 that material if he was inclined to find that it was similar

11 or somehow to be engaged here.

12         So I -- I don't want us to get going and then we're

13 up against those kind of issues.  I'm not asking for a

14 continuance because I want to get the case going.

15         THE COURT:  Sure.  And I don't -- I imagine

16 Ms. Moore could just somehow do it without Ms. Williams,

17 right?  If I decided to allow in his prior convictions,

18 there's more than one way to do that, but --

19         MS. MOORE:  Well, if I may, Your Honor, you know,

20 typically most cases, the prior conviction comes in but not

21 the underlying facts.  So certainly I think that Ms. --

22 Detective Shirley-Williams' testimony or proffer that we've

23 made regarding what she would testify to is relevant for the

24 court's consideration.  Depending on how the court rules if

25 the prior conviction is admissible, which I purport that it

19

1   is, because, according to the elements, the defendant

 2   knowingly possessed these items, and that prior conviction

 3   certainly shows that the defendant knowingly possessed child

 4   pornography which is similar in that it depicts images of

 5   children engaged in sexually explicit conduct, which we also

 6   have to show in this case that these depictions depicted

 7   children engaged in sexually explicit conduct.

 8          So we think that certainly that prior conviction is

 9   very relevant to his knowledge and intent; that this was no

10   mistake; that this was no accident; that he was specifically

11   looking for these images; and that he possessed these images

12   knowingly.  Again, we think that prior conviction is very

13   relevant.

14          Certainly I would -- if the court rules that we are

15   able to present that prior conviction, we could present also

16   the prior plea agreement or the prior conviction could be

17   stipulated to.  That would not necessarily require the

18   testimony of Detective Shirley-Williams.

19          There are a couple other things I would like to

20   address this morning.

21          THE COURT:  Before we get off here, real quick,

22   Mr. O'Connor, I understand you're just going to be arguing

23   element number two, that the visual depictions depict minors

24   engaging in sexually explicit conduct.

25          MR. O'CONNOR:  Correct.

20

1          THE COURT:  You're going to agree to all the other

        2    elements.

        3          MS. MOORE:  Well, element five is that the defendant

        4    knew at the time of possession the visual depictions depicted

        5    minors.

        6          MR. O'CONNOR:  That's an element that the state --

        7    the government has to prove.  It has to prove it.  I'm not

        8    arguing it.  My whole argument here is whether or not those

        9    are minors explicitly engaged in sex, period.

       10          THE COURT:  I'm just trying to figure out as we --

       11    as I'm trying to figure out what's more probative than

       12    prejudicial, what we're really going to be having our trial

       13    about.

       14          MS. MOORE:  I guess I don't see how -- it's a bit

       15    confusing because then you're admitting that he knew the

       16    visual depictions depicted minors, but you're going to argue

       17    to the jury that they were not minors?

       18          MR. O'CONNOR:  I'm not admitting anything, but my --

       19    but I think, if I'm answering the court's question correctly,

       20    my entire focus is what is -- is whether those photographs are

       21    minors engaged in sex because you have the head of a minor and

       22    the body of an adult.  So is it the whole person, half a

       23    person?  That's my argument.

       24          THE COURT:  Uh-huh.  Has your client decided if he's

       25    going to testify?

                                      21

MR. O'CONNOR:  He is not testifying.  We have an
instruction.

          MS. MOORE:  And that actually brings up another
thing that I wanted to mention this morning is, well, the --
when we submitted the instructions, Mr. O'Connor wanted to
submit a separate instruction under what was formerly No.
4.01.  That instruction has become encompassed in Instruction
No. 3.05, and so referring to the instructions, it's 18B is
Instruction No. 3.05, and then Mr. O'Connor submitted
Instruction No. 4.01, which is Instruction 19.

          Essentially the language is exactly the same in the
last paragraph of Instruction 18B and Instruction 19.  So I
would -- if Mr. O'Connor wants a separate instruction, then I
would ask that that paragraph be removed from Instruction No.
3.05.  I think we'll have time to talk about that, but I
wanted to get that on the record now so that we're aware of
it.

          MR. O'CONNOR:  I just think I want a separate
instruction --

          THE COURT:  What's the language we're actually
talking about?  I've got a clean copy.

          MR. O'CONNOR:  No. 19 is my instruction.

          THE COURT:  What are the words in essence?

          MR. O'CONNOR:  There's no burden upon the defendant
to prove that he is innocent.

                              22

THE COURT:  Okay.  If you want it separate, then --

         MS. MOORE:  I think the -- well, I'm confident the
pattern instructions have indicated 4.01 is not used anymore.
That language is encompassed in the burden of proof
instruction.  However, I think courts have given it
separately, and then I would just ask for it to be removed
from the burden of proof instruction.

         MR. O'CONNOR:  That's fine.

         THE COURT:  Yep.  We'll get it out, put it separate
so it's not in there twice.

         MS. MOORE:  The second thing I wanted to mention is
actually that TFO Albers has to testify at a detention hearing
at 10:45; so while we're selecting the jury, he's going to
have to step out for a few minutes if that's okay.

         THE COURT:  That's okay.  Hopefully it's here in
this courthouse.

         MS. MOORE:  It is.  I think that's all I have for
this morning.

         MR. O'CONNOR:  Just one other matter, Judge, until
you make that ruling, the Probation Officer Hille, I would ask
that if the court's ruling is going to stand where the other
evidence is not going to be allowed, then I would ask that she
be referred to as a federal officer and not a federal
probation officer because saying she's a federal probation
officer obviously --

                          23

```
 1              THE COURT:  She's agreeable.

 2              MS. MOORE:  That's fine.

 3              MR. O'CONNOR:  Perfect.

 4              THE COURT:  The ruling stands until otherwise.

 5              MR. O'CONNOR:  The court's ruling?

 6              THE COURT:  The court's ruling stands until

 7   otherwise noted.  Anything else while we're waiting on the

 8   jury?

 9              MR. O'CONNOR:  No, sir.

10              THE COURT:  Nothing else, Ms. Moore?

11              MS. MOORE:  No, Your Honor.

12              THE COURT:  At this point I've got a friend who's

13   attending part of the trial today.  I know we're all pretty

14   concerned about who's watching what evidence and how that's

15   coming up.  I'm not going to alter that presentation of the

16   evidence, but given the highly sensitive nature of this case,

17   we have somebody sitting in the courtroom.  I just wanted to

18   be totally honest with you.

19              MR. O'CONNOR:  Judge, Luke Callahan is in our

20   office.  He's just going to sit with me to pick the jury.

21   Then he's going to leave.

22              THE COURT:  Okay.

23              MS. MOORE:  Is it okay if Detective Shirley-Williams

24   is?

25              THE COURT:  Oh, sure.  I'm not kicking anybody out.
```
                                   24

1    I'm just trying to be honest.  All right.

        2           Just for clarity, the government's motion to

        3    preclude the introduction of comparable material is granted.

        4    We'll see you when we get the jury.

        5           (A recess was taken.)

        6            (Voir dire filed separately.)

        7           (The following proceedings were had out of the

        8    presence of the jury:)

        9           THE COURT:  Ms. Moore, anything before opening?

       10           MS. MOORE:  No, Your Honor.

       11           THE COURT:  Mr. O'Connor?

       12           MR. O'CONNOR:  No, Judge.  I won't be making an

       13    opening statement.  So when she gets finished, we're just

       14    going to the evidence.

       15           MS. MOORE:  Very good.  I guess there is something.

       16    Sorry.  Do you -- does it matter if I use this podium, or

       17    should I use the one with the microphone?

       18           THE COURT:  If you use that one, you'll be fine

       19    because the microphone is right there, and you're right by

       20    Gayle so she'll be able to hear you.

       21           MS. MOORE:  Thank you, Your Honor.

       22           THE COURT:  Wherever you're most comfortable.

       23           (The following proceedings were had in the presence

       24    of the jury:)

       25           THE COURT:  Welcome back, ladies and gentlemen of
                                       25

the jury.  As we discussed, we'll do some jury instructions,

have opening statement, proceed with the witnesses.

                    (Instructions read.)

          THE COURT:  Ms. Moore, opening statement.

          MS. MOORE:  Thank you, Your Honor.  May it please

the court.

          THE COURT:  Please proceed.

          MS. MOORE:  Counselor.

           GOVERNMENT'S OPENING STATEMENT

          MS. MOORE:  Debbie Atwood was at work, a normal day,

and she noticed a stack of unclaimed documents on a printer;

so she picked up the documents, turned them over, and was

surprised and upset by what she saw.  Debbie Atwood will tell

you that when she turned those pages over, she saw what she

will describe as colored drawings of a boy who appeared to be

between the ages of 6 to 10 engaging in numerous sexual acts

with a woman the captions described as mom.

          Debbie was upset by that.  She works at the

Mid-Continent Public Library, the Blue Ridge branch, which is

located here in the Western District of Missouri, and when she

was at work that day, when she turned those over, she figured

out she needed to determine where these images came from.  And

she'll tell you she didn't look through the whole stack.  She

looked through a few, was very upset, because in her

estimation they depicted children.  And so she wanted to find

                              26

out how these images got on that printer.

So Debbie started -- she was supervising at that time, and so she started talking with the other employees at the library and realized the normal computer printer -- there's a computer section at the library that has a number of computers library patrons can use -- was down that day. It wasn't working. So anyone who wanted to print had to print their -- select print, then go up to the front desk to have their print job released, pay for the print job at the front desk, and pick up the print job at the front desk.

It turns out that the printer at the front desk had run out of toner during a large print job, and so the individual who came to the front desk paid for all the images he was printing, which was $30. She'll tell you that it was 50 cents a page to print a colored image, but because the toner had run out, he didn't obtain all his images, and he left the library.

When library staff figured out that the toner needed to be changed, they changed the toner, and then the print job continued. So Debbie Atwood was able to go into the computer and see what print jobs had been run that day. And there was only one large print job that was color prints. She was able to look at the user, the library user, who printed that job, and determined it was associated with Mr. Buie's library card.

And you'll hear about how the computers are set up

1    at the library.  This particular library is a pretty busy

         2    branch, and they have a number of computers, and any library

         3    patron can come in and use the computer.

         4           When the patron signs onto the computer, they have

         5    to put in their library card number, and they have to put in

         6    their date of birth.  And then they have to click a box that

         7    says "I accept," and that's the library terms of use for the

         8    computer.

         9           If anyone's used a computer, often there's terms of

        10    use that you have to accept before you can use certain

        11    computers.  In this case the acceptable terms of use policy

        12    also talks about that the individuals can't go to

        13    inappropriate content.  So the user has to put in their

        14    library card number, their date of birth, and click "I

        15    accept."

        16           Now, the library, to protect the privacy of their

        17    patrons, which is very important to them, they're not able to

        18    see on the computers what individuals are looking at on the

        19    computers.  The computers are in the open; so if they walk by,

        20    they may see something on a screen.  But they don't have a

        21    system set up in place where they can be on a central computer

        22    and see what everybody's looking at.  That would violate their

        23    users' privacy.  So the library doesn't know what websites

        24    people are going to.

        25           Debbie Atwood will tell you that once she determined

                                      28

it was Mr. Buie who had printed these items, she collected
them, and she notified her supervisor. What had actually
happened is Debbie went back in to reprint everything Mr. Buie
had printed so she had all of the documents he had printed,
even the ones he took home, and then she provided all of those
to her supervisor, and it was for a couple reasons.

One reason was Mr. Buie had violated the library's
terms of acceptable use for the computer, and when someone
does that, they can be banned from computer use for 30 days.
So they need to report that to the administrative offices of
the library system. But the other reason she turned
everything over to her supervisor is because the images
depicted what she describes as children, and she was concerned
that a crime was being violated.

Using her reason and common sense, Debbie Atwood
went home after work that night, and it just so happens that
her husband is a Kansas City, Missouri, police officer. And
Debbie will tell you I felt like I needed to report it to the
police, and my husband's a police officer. So that's who I
reported it to.

Her husband, Police Officer Mitchell Atwood, will
come in and testify and he'll tell you that I did take the
report from my wife. He'll say that's my job. That's what I
do. I report crime. So he took the report. He contacted a
detective unit, and after the report was made, forwarded that

29

1  to a detective unit for follow-up investigation.

2          The branch manager of the library, Gerry Haile,

3  Geraldine Haile, will come in and explain to you what she did.

4  She was actually at a meeting at the administrative offices

5  when these images were located.  When she got back, she was

6  provided the images.  The library staff explained what had

7  happened to her, and she took custody of the images, and she

8  then took them to the South Patrol Division of the Kansas

9  City, Missouri, Police Department and made a police report

10  about the images and turned all the images over to the Kansas

11  City, Missouri, Police Department.

12          Debbie Atwood is also going to tell you that when

13  she was able to determine it was the defendant who printed the

14  images, that brought to mind another incident that she had had

15  with the defendant.  She'll tell you that in June of 2017,

16  before this occurred -- this was in July, July 11th through

17  13th of 2017.  In June of 2017, Mr. Buie was in the library,

18  and he was a regular patron at that library.

19          Ms. Atwood was supervising at that time, and one of

20  the library pages came up to her and said they had walked

21  through the computer area and were concerned about someone

22  using -- displaying inappropriate material on the computer.

23  Ms. Atwood will tell you that what she can do, although she

24  can't look and see what everyone's doing on their computers,

25  she can send instant messages to computer users.

30

1    And so she will tell you she sent Mr. Buie an

2    instant message that said essentially you've been reported for

3    looking at inappropriate material.  Shortly after that,

4    Mr. Buie got up and left the library.  When Debbie Atwood

5    realized that Mr. Buie was the one who printed these images in

6    July, she also recalled that event with Mr. Buie.

7         So after the report was made and after Gerry Haile

8    turned all the images over to the Kansas City, Missouri,

9    Police Department, a federal officer who has regular contact

10   with Mr. Buie was forwarded the police reports, and this

11   officer is Sandra Hille.  And she will come in and tell you

12   that as soon as she received the police report about Mr. Buie

13   and these inappropriate images that display minors engaged in

14   sexually explicit conduct with adults, she went to Mr. Buie's

15   home, and that was on July 13th of 2017.

16        Mr. Buie lives in the Western District of Missouri

17   as well.  She went to his home with her partner, and they

18   asked to search Mr. Buie's home, and he did provide consent.

19   They found a stack of printed images on Mr. Buie's kitchen

20   table, and Sandra Hille will tell you that the images depicted

21   in her estimation and what she believes are minors engaging in

22   sexually explicit conduct with adults, and that the adults

23   were called mom in some of the images.

24        Sandra Hille will tell you she questioned Mr. Buie

25   about the events that led up to this and what had been going

31

on.  When she talked to Mr. Buie in questioning, Mr. Buie told

her that since March of 2017, he had been traveling to various

libraries in the Kansas City metropolitan area for the purpose

of viewing depictions of what was referred to as child

pornography anime.

Mr. Buie also told Ms. Hille that he would print or

attempt to print the child pornography anime using the

library's printers.  Mr. Buie told Sandra Hille that he

estimated on average he would visit libraries once a week for

that purpose.

Mr. Buie told Ms. Hille that on one occasion in the

spring of 2017, he was printing child pornography anime at the

Red Bridge branch of the Mid-Continent Public Library and he

was asked to leave that branch after another patron complained

about seeing him viewing depictions of children engaging in

sexually explicit conduct.  Mr. Buie admitted to viewing the

child pornography anime and that he had attempted to print it.

Sandra Hille collected all the images from

Mr. Buie's kitchen table, and she contacted Task Force Officer

David Albers and went to the FBI to turn those images over to

David Albers.  David Albers will come in, and he's going to

tell you that he obtained the images that were from Mr. Buie's

home, and he also obtained the images that were printed at the

library.  And he was able to compare them and found several of

the images in Mr. Buie's home were identical to the ones that

1   he had printed in the library on the 11th of July.

2           David Albers will tell you that in his training and

3   experience as an investigator who investigates crimes against

4   children and child exploitation cases, he viewed those images,

5   and it's his belief that they represent children engaged in

6   sexually explicit conduct with adults.

7           At the close of all the evidence, the government is

8   going to ask you to find this defendant guilty of possession

9   of child obscenity.  Thank you.

10          THE COURT:  Ms. Moore, would you like to call your

11  first witness, ma'am.

12          MS. MOORE:  Thank you, Your Honor.  The government

13  calls Debbie Atwood.

14  DEBBIE ATWOOD, being duly sworn by the courtroom deputy,

15  testified:

16  DIRECT EXAMINATION BY MS. MOORE:

17  Q    Good afternoon.  Please state your name for the record.

18  A    Debbie Atwood.

19  Q    And how do you spell your last name?

20  A    A-t-w-o-o-d.

21  Q    In July of 2017, where were you employed?

22  A    Mid-Continent Public Library, Blue Ridge branch.

23  Q    Where is that located?

24  A    9253 Blue Ridge Boulevard, Kansas City, Missouri.

25  Q    And you're no longer employed with the library; is that

                              33

```
 1   correct?

 2    A    That is correct.

 3    Q    Is that pretty recent?

 4    A    Yes.

 5    Q    How long were you employed with the library?

 6    A    A little over 16 years.

 7    Q    What were your duties with the library?

 8    A    My job title most recently was technology associate.  I

 9   did a lot of customer-facing-customer service and worked full

10   time 40 hours a week.  I did education, computer training,

11   early literacy, and reading stories to children.  A lot of

12   outreach to schools and different groups.

13    Q    Thank you.  What -- you said you worked 40 hours a week.

14   Did you have a typical work shift or different -- kind of a

15   staggered work shift?

16    A    I did have a typical work shift.  Monday and Tuesday I

17   worked 8 a.m. to 5 p.m.  Wednesday I worked noon to nine.

18   Thursday I worked 8 a.m. to 5 p.m., and then Fridays my

19   schedule varied.  I either worked 8 to 5, 9 to 6, or I was

20   off, and then I worked one Saturday a month, 8 a.m. to 5 p.m,

21   And then we had an hour change, and then it was nine to six,

22   and then sometimes Sundays one to five.

23    Q    What were the normal hours that the library was open or

24   is -- I assume it's still open.  I know you don't work there.

25   But what are the normal hours at the library?
```
34

1    A    They are Monday through Thursday 9 a.m. to 9 p.m.;

     2   Friday –– let me think –– 9 a.m. to 6 p.m; Saturday 10 a.m. to

     3   5 p.m., maybe six, ten to six; and then Sunday one to five.

     4    Q    Thank you.  I want to talk to you about events that

     5   occurred at the library related to the defendant in this case,

     6   David Buie, and I want to go through a little bit of the

     7   library's setup with you to help with your testimony.  So I'm

     8   going to show you some exhibits.

     9            MS. MOORE:  If I may approach, Your Honor.

    10            THE COURT:  Yes, you may.

    11    Q    (BY MS. MOORE) And I'm just going to ask you to review

    12   these, Exhibits 4, 5, 6, 7, 10, 11, and 12, and if you can

    13   just –– you don't have to describe them in detail, but just

    14   generally describe what they are.

    15    A    Okay.  Exhibit 4 is a picture of the front of the

    16   library as viewed from our parking lot.

    17            Exhibit 5 is a view of the interior of the library

    18   as if you had just walked through the front door.  So it's a

    19   view of a display and our service deck, and you can also see

    20   the computers from that view.

    21            Exhibit 6 is also a view from the front door.

    22   However, you can see more of the left-hand side of the

    23   library, which includes the children's area, our program

    24   space, and a self-serve return station.

    25            Exhibit 10 shows our public computer area, part of
                                      35

it. We do have public computers in other sections of the
library, but this shows computers numbers 1 through 24
stationed through four different computer -- round computer
tables, six at each table. Exhibit No. 10 shows our service
desk. It is a U-shaped desk with a detached island behind it.
There are three chairs at that desk. Two of them are staffed
at any given hour that we are open. The third one is usually
open for roaming.

          Exhibit 11 is also another view of our service desk.
It shows the station that we refer to as the roamer station,
which faces the children's area, and also shows the front
station which faces our front entrance door.

          And Exhibit 12 shows the roamer station again which
also faces the children's area.

Q    Are these exhibits fair and accurate depictions of the
Blue Ridge branch library?

A    Yes, they are.

Q    And then Exhibit No. 13, is that a floor plan of the
Blue Ridge branch library?

A    Yes, it is. It's one that I'm very familiar with.

Q    Is it a fair and accurate depiction of how the library
is set up?

A    It most certainly is.

Q    All right. Thank you very much.

          MS. MOORE: Your Honor, at this time the government

1   would move for admission of Exhibits 4, 5, 6, 7, 10, 11, 12,

2   and 13.

3           MR. O'CONNOR:  No objection.

4           THE COURT:  All of those are admitted.

5           MS. MOORE:  And may I publish them to the jury, Your

6   Honor?

7           THE COURT:  Yes, you may.

8   Q    (BY MS. MOORE) Okay.  So this is the Blue Ridge public

9   library; is that correct?

10  A    That is correct.

11  Q    Can you give us a little information about the library.

12  Is it used often?  Is it a pretty busy place?

13  A    We are located in a somewhat urban section of south

14  Kansas City on a major thoroughfare, Blue Ridge Boulevard.  We

15  are next door to Dobbs Elementary School.  We have many

16  businesses and churches next to us.  So we do have people who

17  come by foot, but we also have a lot of vehicular traffic.  We

18  on any given day, and I'm saying "we" because I just recently

19  stopped working there, but on any given day, our visitor count

20  could be anywhere from a few hundred on a day that we're only

21  open a few hours to seven or eight hundred people on any given

22  day.  So we can be very busy.

23  Q    And then, just so the jury can get an idea of how the

24  library is set up, what does Government's Exhibit No. 5

25  depict?

                            37

1    A    That is what our library branch looks like when you walk

2    through the entry door, which is the only, you know, way that

3    the public accesses the Blue Ridge branch.  So from there, you

4    can see some items that are on display.  To the right, you can

5    see some desks where chairs, tables that people can sit and

6    meet at.  You've got our service desk there with a TV that

7    displays upcoming programs or events, and the service desk is

8    where the staff are usually at to assist the public.

9    Q    Thank you.  And what does Exhibit No. 6 depict?

10    A    That is also a view from the front entrance, except in

11    that picture you can see a return station.  You can also see

12    the service desk and, again, some items that are on display,

13    and then you see part of our program area where we would do

14    early literacy story times, where we would do other

15    informational programming, and you can also see the children's

16    area visible from there.

17    Q    So I'm going to show you Exhibit No. 13 now.  So when

18    you walk in the front door of the library, where are the

19    computers located?

20    A    Okay.  The first computers that you would come to when

21    you walk into the front entrance are to your right.  There are

22    three standup stations that we refer to as express computers.

23    Customers can use those for ten minutes.  They're just meant

24    for quick things.  Immediately to your left when you walk in,

25    there is what we call a mommy and me station.  There are two

38

early literacy computers for children to get on, and then there is a workstation in between for a parent or a caregiver.

If you walk into the entryway and go straight back on the right-hand side where you see the -- little off on my geometry -- but the six-sided tables, there's four of them. There are six computer stations at each table for a total of 24.

Q    And Government's Exhibit No. 7, what's that depict?

A    So that is -- that is the four sets of tables with six computers on each.  The sign above saying public computers, those are wired computers, desktop computers.

Q    When you say "wired computers," what do you mean?

A    They're not wifi like a device or a laptop.  They're hard wired into our Internet.

Q    And so from all of these 24 computers, can users access the Internet?

A    Absolutely they can, as long as they have a valid library card and they know their pin number.

Q    Are these computers used often?

A    Yes, they are.  In fact, if you look at our -- at the branch statistics for the Blue Ridge branch, that is the primary reason why people are visiting that particular branch is to use the computers.

Q    So who would be a typical person that would come in, from your experience, to the library to use the computers

39

1   there?

2   A    There really is no typical computer use.  It could be

3   anything from somebody who has a computer at home and has run

4   out of ink in their printer and needs to print something

5   quickly.  It could be somebody who does not have access to

6   Internet in their home.  It could be somebody that's just

7   taking a break from work and doesn't have time to run home.

8   They just need to do something really quick.  And it could be

9   somebody who, again, doesn't have computer use in their home

10  and they come into the library very frequently to use the

11  computers.

12  Q    So if customers need help with the computers, do you

13  have staff that can help them with the computers?

14  A    Absolutely.  The Blue Ridge branch has trained all of

15  their staff with the exception of our entry-level pages.  All

16  of our staff are trained and equipped to assist people with

17  basic computer needs.

18        We also have work study students, an agreement with

19  Longview Community College, to come and sit -- you can see a

20  little portion of the table in the lower left-hand corner.  We

21  will have these work study students sitting there to assist

22  with computer needs when their schedules permit.

23  Q    If a patron wants to use the library computer, are there

24  rules that have to be followed?

25  A    There certainly are.  In order for somebody to be

                              40

1  successful in signing in to use a computer, as I mentioned

2  earlier, they need to have their library card, either their

3  physical card, or they need to have the card number memorized.

4  They also need to know what their pin number is, and once they

5  put that information into the computer, they have a choice of

6  a filtered or an unfiltered session, and then they must accept

7  our acceptable use policy.  And that policy stipulates the

8  rules that they must follow in order to use our computers.

9  Q    When you say they have the choice of filtered or

10  unfiltered, explain what that means.

11  A    Because of the children's online privacy protection act,

12  our computers automatically filter out objectionable material

13  for anyone that's under the age of 18; so that is an automatic

14  -- that automatically happens.  Adults have a choice.  They

15  can choose to have the content filtered or unfiltered.

16  However, even if they choose to have unfiltered content, our

17  acceptable use policy still tells them that viewing

18  objectionable images is prohibited.

19  Q    Where is the printer normally located for these 24

20  computers?

21  A    Well, in looking at the picture that's on the screen

22  right now, the printer would be almost directly across from

23  that table in the lower left-hand corner.  So it is just

24  slightly out of the viewing range in that picture.

25  Q    On -- let me ask -- show you another exhibit.  On July

41

1  11th, 2017, do you know if the library printer for the public

2  computers was working?

3  A    The printer was not working that day.

4  Q    I'm going to show you Exhibit No. 10, and what is this?

5  A    That is our, what we call, our service desk.

6  Q    And is that the main -- is that the only service desk,

7  the main desk in the library?

8  A    That is the main desk where customers are accustomed to

9  coming to get service, especially if there is no work study

10  student at that little table over by the public computer area.

11  And even if somebody is there, customers are used to getting

12  assistance from library staff anyway.  So often they bypass

13  that person.

14  Q    From -- it looks like there's a computer or a couple

15  computers at this front desk.  From those computers, can you

16  see what individuals are doing on the 24 computers or the

17  other computers in the library?

18  A    From that computer, the information that we have access

19  to is we can look to see if a computer is in use.  We can look

20  to see the card number of the computer -- who's using that

21  computer, and I think it will also tell us how much time they

22  have left in their session.  But we cannot see what they are

23  looking at.

24  Q    And what does Government's Exhibit 11 depict?

25  A    That is another view of our service desk.  That would be

42

1    as if staff were behind the desk.  We are seeing what we call

2    the front station, which would be facing our entrance doors,

3    and then another station called the roamer station, which

4    faces our children's area.

5    Q    And then, finally, Government's Exhibit No. 12, what

6    does that depict?

7    A    And that is also our roamer station, which is typically

8    not staffed.  It is an overflow station where -- for times

9    when we are busy, and we have a buzzer at the desk that will

10   help notify staff in the back workroom that help is needed on

11   the floor.  And also from that picture, you can see the

12   printer that staff use out there on the floor.  That's not

13   typically a printer that our customers have access to.

14   Q    All right.  Now, you indicated that on July 11th of

15   2017, the printer for patrons was not working.  So what would

16   patrons have to do that day if they wanted to print a job?

17   A    If they wanted to print, they would have to come to the

18   service desk and either let staff know which computer they

19   were on so we could look up the job, or they would have to

20   show their library card so that we could look up the job.  And

21   then we would release the print job manually from our

22   workstation, which would then print at the staff printer.

23   Q    And how -- so on July 11th, all print jobs had to come

24   through this computer -- or printer, excuse me; is that

25   correct?

                              43

1    A    That is correct.

2    Q    So when print jobs came through the printer, was library

3    staff able to see what the print jobs were?

4    A    What I can tell you is what I did personally as an

5    employee.  Whether or not my other coworkers follow this or

6    not, I'm not sure, but the library really takes privacy -- we

7    really respect the privacy of people.  And so we really don't

8    want to see what they have printed.

9          So typically when things come off the printer, I

10   would hand them face down and I would ask the customer to look

11   at them and verify that they have everything they were

12   expecting.  And then, of course, there's money that exchanges

13   because it's 10 cents per page if it's black and white; 50

14   cents per page if it's in color.  So we would have taken the

15   money before we released the prints.

16   Q    From on this printer, do you know if the documents are

17   printed face up or face down?

18   A    They are printed face down.

19   Q    So I want to talk to you about this particular print job

20   that came through on July 11th, 2017.  Can you explain what

21   you were doing and how -- and what you found on this printer.

22   A    Okay.  So every hour at the library there is a shift

23   change.  So depending on what staff are doing at any given

24   time, there might be staff that are already out on the desk.

25   There might be staff coming from the workroom to take

44

somebody's place out on the desk.  It was a shift change time.
I had been in the workroom, and so I was coming to take my
place out on the desk.

And it was very clear that things were a little
chaotic.  There were lots of people waiting for prints.  It
was very busy at the desk, and I noticed that there was a very
sizeable stack of papers on the printer.  And I -- a coworker
had told me that the printer was broken, and so jobs were
being printed from the staff printer.

And I went over to the printer that we see in the
picture, and I started to lean over to grab the papers that
were on there because I didn't see that there was a customer,
like, waiting for prints.  And so I was about to ask what are
these, and a male coworker said, Yeah, you don't -- you don't
want to look at that.  And I said, Are you kidding me?  And he
said, No.  And I said, Well, we can't leave them here because
in the meantime we've got other customers that are coming up
and wanting things to be printed, and I certainly didn't want
to run the risk of handing somebody something that wasn't
appropriate.

I had not looked at these yet, but then I leaned
over and I just flipped over the first page to see what it was
and took the whole job off and put it face down on the
computer -- on the desk next to me.  And then I got into our
computer system.  Our print --

1    Q    Can I interrupt you for a minute.

2    A    Yes.

3    Q    I'm sorry.  So when you picked the paper up, the

4    document up and looked at it, what did you see?  Can you

5    describe it?

6    A    Yes.  I saw what appeared to be --

7              MR. O'CONNOR:  Judge, I have an objection.  Can we

8    approach?

9              (Counsel approached the bench and the following

10   proceedings were had:)

11             MR. O'CONNOR:  I think she can testify to what she

12   saw, but her opinion of whether or not it was child

13   pornography, I do not think she can give that opinion.  It

14   invades the province of the jury.  It's the whole idea of the

15   jury to determine whether or not this is child pornography.

16   It would be no different if I wanted to bring in three people

17   that looked at the same picture that said I don't think it's

18   child pornography.  It appears to be an adult body on a

19   child's face.

20             THE COURT:  Objection is noted and overruled.

21             MS. MOORE:  Thank you.

22         (The proceedings returned to open court.)

23   Q    (BY MS. MOORE) All right.  Can you please describe what

24   you saw on that printed page.

25   A    Okay.  In library terms, we would consider it not comic

                              46

1   strip or cartoon but graphic, animated, full color, a

2   depiction of an adult Caucasian female with blond hair

3   completely nude from the waist up.  That was probably -- took

4   up on an 8 and a half by 11 piece of paper a pretty big part

5   of the upper right-hand corner.  I don't know if you're

6   getting that visual with my hands there.

7          But that was really all I needed to see to tell me

8   that it was a violation of our acceptable use policy.  So, as

9   I said, I put it back face down, took the whole stack off the

10  printer because I didn't want to leave it there, put it face

11  down on the desk next to where I was stationed, and then got

12  into our computer program, were able to look at the print

13  queue and were able to go into a button that says reprint, and

14  then from there, I could pinpoint the card number associated

15  with the job.

16         Because it's library policy that if somebody

17  violates our acceptable use policy, we make an annotation on

18  their record, and if they violate it twice, then they are

19  temporarily barred from computer use for 30 days.  So it was

20  my responsibility to figure out who printed this and make that

21  annotation on the card.

22  Q     Did you -- were you able to determine who printed it?

23  A     Yes, I was.

24  Q     And do you know who that was?

25  A     It was David Buie.

                        47

1  Q    Did you -- so what did you do next in relation to the

2  images?

3  A    After I discovered that the card number was linked to

4  that account, I went to the record, the library record by

5  putting in the card number, and it was at that time when I

6  noticed that there was a previous AUP violation, one that I

7  actually gave the same customer just a few weeks earlier.  So

8  I went ahead and I marked the record, and then I took the

9  whole stack of papers with me into the workroom, which is a

10 secured area that only library staff go, and I put them face

11 down on my assistant branch manager's desk.

12          And I said -- I said, I'm not putting these here for

13 you to look at, because nobody should have to look at them,

14 but I just want you to know that one of our customers printed

15 off $30 worth of inappropriate material.  I'm not really sure

16 what to do with it, but I really don't want to put it in lost

17 and found.  I am not going to call the customer and let him

18 know that he left without all of his papers.  So I suggested

19 that the material be shredded, and he agreed that that was an

20 appropriate course of action.

21 Q    So tell us a little bit -- you said you had sent -- you

22 had reported something from a few weeks earlier.

23 A    Yes.

24 Q    What happened then?

25 A    That was -- I don't recall the exact date, but it was in

                            48

1  June.  I want to say it was later in the month, maybe the

2  27th, 29th.  I'm not entirely sure.  But it was a Wednesday

3  night and I was the senior staff person on duty, and one of

4  our pages, a high school student, came into the workroom and

5  told me that one of our customers was viewing inappropriate

6  material on the computer.

7       I asked him what computer the customer was at, and

8  he said, I don't really recall, do you want me to go out there

9  and look?  And I said, No, I don't want you to be exposed to

10 that again, but can you describe to me what the customer

11 looked like?  So he gave me a very good description of the

12 customer.  He said he was an older white male with white and

13 gray hair wearing glasses, and he described the color shirt

14 that he was wearing as being kind of an orangey, salmon-

15 colored shirt.  And I did recall earlier that evening seeing a

16 customer that matched that description and knowing that that

17 customer had been on the computers.

18      So I thanked my coworker, and I told him that I

19 would check it out myself.  And I left the workroom area.  I

20 made a pass around the Internet area, and I noted the

21 gentleman that was being described and took a glance at his

22 monitor and noticed that he was not looking at anything at

23 that particular moment.

24      However, I do trust my coworkers and did not feel

25 that the coworker would have any reason to tell me it was

49

1  inappropriate if it wasn't inappropriate.  I came back to the
2  service desk that we see in that picture to whisper to my
3  other coworkers to let them know that I was getting ready to
4  send a message directly to that customer's computer kind of
5  like a chat message.  Again, another way to protect privacy
6  and not have a discussion out in the open air for other
7  customers to hear.
8          I told them that I was going to send this notice to
9  the customer to let him know that he had violated our
10  acceptable use policy and that he was getting an AUP violation
11  on his record.  And, as I was sharing that with my coworkers,
12  our off-duty officer, Officer Wyatt --
13  Q    I'm sorry to interrupt you --
14  A    Yes.
15  Q    -- at this point.  So that was in June?
16  A    Yes.
17  Q    And you -- so when you received this information, what
18  steps did you take then?  I don't want to interrupt you, but
19  did you then send that --
20  A    I did send -- I sent a message to Mr. Buie after -- like
21  I said, we can look at the card number that's associated with
22  the computer session, and we can send direct messages to that
23  monitor.  And I sent him a message telling him essentially
24  that when he signed up to use the computers, he accepted our
25  acceptable use policy, and that he was violating it by looking

                                50

1    at images that were inappropriate in a public library setting.

2             That was not only corroborated by the page who

3    brought it to my attention, but an off-duty officer that was

4    working there that evening also approached and told me that he

5    also saw inappropriate material on the monitor.

6    Q    Shortly after sending that message, did Mr. Buie leave

7    or what happened?

8    A    He did.  He -- I would say within five minutes, he

9    logged off his computer session and then left the library

10   building.

11   Q    Now, so getting back to July 11th, so -- I guess after

12   that June incident, did you notice Mr. Buie in the library

13   again?

14   A    Yes.

15   Q    And getting back to July 11th, you've testified that you

16   took images into the office and gave them to the assistant

17   branch manager, and you were going to shred them?

18   A    I put them on the corner of his desk just to have a

19   brief conversation and to get his opinion as to what should be

20   done with them because it was a large stack of papers.  Like I

21   said, it was a -- I believe Mr. Buie paid $30 for the job

22   because it was full color.  So that would have been 50 cents a

23   page, it would have been 60 pages of material.

24            Because of a -- because that printer ran out of

25   toner in the middle of the job, the prints stopped.  That was

51

part that I hadn't shared.  The print job stopped and a

coworker handed Mr. Buie the prints that came off, and then

the toner cartridge was replaced, the print job resumed, but

Mr. Buie had already left the building.  That is how we came

to be in possession of at least half of the print job.

So after my assistant branch manager agreed that

maybe shredding them was the best course of action, I took

them into the branch manager's office.  She was not in the

building at the time.  She was off-site at a meeting, and she

is the only one who had possession of a shredder, and I began

shredding the pages.  In the process of shredding them, I was

shredding them, you know, not looking at the images but with

the images away from me.  But then anything that's printed

from the Internet unless it's a Word document or something, it

will print kind of a banner on the bottom of it that tells the

website.

And I wanted to look at the page to look to see what

website that was from because I wanted to contact our IT

department and say why can't this be blocked.  Like if it's

against our acceptable use policy, you know, why can't we

block this, and when I looked at the banner, I saw that one of

the words in the banner was "incest," and that caused me to

look further at the picture.  And it was then that I realized

that it wasn't just inappropriate images.  It was a depiction

of a boy who was having -- doing sex acts with his mother, and

1    that brought everything to a whole different level for me.

2            But I continued to shred the entire packet of

3    information, and then I went back into the workroom and told

4    my assistant branch manager that, you know, it was a little

5    bit higher level than what we initially thought and that I was

6    going to go ahead and do the incident report, which is a

7    policy that we have whenever there is something that is

8    behavior related or might cause somebody to lose access to

9    their library privilege.

10   Q    So did you do the incident report?

11   A    I did.

12   Q    And what did the incident report report essentially?

13   A    Well, basically everything that I've just shared, what

14   happened that day, how we came to be in possession of the

15   documents, that the documents were shredded.  I'm not sure

16   what else to say about that.

17   Q    Okay.  No, that's fine.  Thank you.

18           When you saw the page or images that you described

19   as a boy, were you able to just look at the image and in your

20   view what you saw, how old would you describe the boy to be?

21           MR. O'CONNOR:  Judge, same objection.

22           THE COURT:  Noted.  You may answer.

23   A    Thank you.  I put the boy at between maybe 6 and 10

24   years old, and the reason why I say that, it has to do with

25   stature, the size difference between the adult being depicted

                            53

1   and the male child, lack of definition in the shoulders and,

2   you know, just kind of straight up and down.

3   Q    (BY MS. MOORE) Okay.  Thank you.  So after the incident

4   report was completed, what happened?

5   A    Whenever we submit an incident report and copies of that

6   automatically go to the senior management team at

7   Mid-Continent Public Library.  So that team is housed at our

8   headquarters, which is located in Independence.

9           And I believe shortly after that was received by our

10  director of libraries and senior management team, my assistant

11  branch manager received a call, and he was asked to direct me

12  to reprint the entire job.  They wanted it as evidence, and

13  when I say "evidence," it wasn't so much, I think, because the

14  library planned to take action.  It was because they wanted my

15  branch manager to come back and view the images to see if they

16  were as bad as I said they were.

17  Q    So when the images were reprinted, what did you do with

18  them?

19  A    They were placed in what we call an interoffice

20  envelope.  So it's an envelope about yea tall, and it's got a

21  string that you seal, seal it with.  I placed them in the

22  envelope, and I put the envelope on my branch manager's desk

23  for her to come in.

24  Q    And who is your branch manager?

25  A    Her name is Geraldine Haile.

                                    54

1    Q    After you put the images or depictions on your branch

2    manager's desk, did you ever see those images again or did you

3    ever -- I shouldn't say see them again.  Have you ever had

4    them in your possession again?

5    A    Thankfully, no.

6    Q    So you notified your branch manager.  Did you also

7    notify anybody else about this?

8    A    I spoke to my husband about them that evening, yes.

9    Q    And what does your husband do for a living?

10   A    My husband is a police officer with Kansas City,

11   Missouri.

12   Q    Did you report it to your husband as a police officer?

13   A    I think I spoke to him about it mostly as a subject

14   matter expert to begin with because -- I'm getting emotional.

15   Sorry.  I have children and I'm a mom, and I care deeply about

16   the community at the Blue Ridge library, and I've come to know

17   the children and the families who come there.  And I had a

18   very strong sense that this issue fell into a very gray area

19   for the library system.

20          MR. O'CONNOR:  Judge, I'm going to object to this

21   response to the question.  The question was what she told her

22   husband.

23          THE COURT:  I think she's going to get us a glass of

24   water here real quick.

25          THE WITNESS:  Okay.

                                 55

1          THE COURT:  Ms. Moore, would you reask your

        2   question, ma'am.

        3          MS. MOORE:  Sure.

        4    Q   (BY MS. MOORE) Did you report this incident to your

        5   husband as a police officer?

        6    A    Initially, no.  I reported it to him because I consider

        7   him to be a subject matter expert on things that I know

        8   nothing about, and I wanted to get his advice on what could be

        9   done.

       10    Q    Did -- after you reported it to your husband, did then

       11   he take a police report about it?

       12    A    Yes, he did.

       13    Q    Okay.  Thank you.  And did you report it to your husband

       14   the same day as it occurred?

       15    A    I did.  I reported it to him that evening.  We discussed

       16   it.

       17    Q    And you -- do you know your husband in fact did file a

       18   police report and contacted the detective unit?  Is that fair

       19   to say?

       20    A    Yes, he did.

       21          MS. MOORE:  I think that's all the questions I have,

       22   Your Honor.

       23          MR. O'CONNOR:  No questions.  Thank you.

       24          THE COURT:  You may step down, ma'am.

       25          May this witness be excused?

                                       56

1          MR. O'CONNOR:  Yes.

2          MS. MOORE:  Yes.

3                    (Witness excused.)

4          THE COURT:  Officer Atwood, if you would come all

5     the way up front, sir.

6     MITCHELL S. ATWOOD, being duly sworn by the courtroom deputy,

7     testified:

8     DIRECT EXAMINATION BY MS. MOORE:

9     Q     Please state your name for the record.

10    A     Mitchell S. Atwood.

11    Q     Where are you employed?

12    A     Kansas City, Missouri, Police Department.

13    Q     How long have you been employed at the Kansas City,

14    Missouri, Police Department?

15    A     27 years.

16    Q     What job responsibilities do you have at the police

17    department?

18    A     I am a patrol officer and currently drive a wagon for

19    2030 sector relief.

20    Q     Prior to this last assignment, can you just give us a

21    breakdown of -- a brief breakdown of some of your previous

22    assignments.

23    A     I was on the bike patrol that started in Kansas City.

24    Then they went to a CAN Center, the Community Action Network

25    Center.  We did that.  Then they went to a community action

                              57

1    team, which worked with, of course, the members of the

2    community, community groups, and was on that -- it was a

3    proactive assignment -- for close to ten years, and then moved

4    back into patrol.

5    Q    Have you taken a number of different reports over the

6    course of your career?

7    A    Yes.

8    Q    And in this particular instance, did your wife, Debbie

9    Atwood, report something to you?

10   A    Yes, she did.

11   Q    And based on what she reported to you, did you feel like

12   you needed to take a report?

13   A    Yes.

14   Q    And why is that?

15   A    Because I believed when she explained what she had

16   found, it -- to me it met the elements of a crime; so I was

17   obligated to report that.

18   Q    So the fact that she was your wife really had no -- made

19   no difference whether you had to report it or not?

20   A    No, no.

21   Q    If another citizen would have reported that, would you

22   have also made a police report?

23   A    Yes.

24   Q    And your wife, Debbie Atwood, was employed at the Blue

25   Ridge library branch at the time?

58

1   A    Yes.

2   Q    We've heard from Debbie.  Can you just briefly tell us

3   just what you took down in the report or why you made the

4   report.

5   A    It was -- I worked that day, and I got home, I think,

6   around six or so.  And she come back in from work and was

7   there and explained to me that they had found some materials

8   at a printer, that the printer had malfunctioned during the

9   day so like only half of the job had been printed.  Then it

10  printed the rest of the job and when she -- I think when she

11  was cleaning up, she found the pages and what was on them and

12  kind of turned them in.  Then when she got home to me, she was

13  upset about it; so she explained to me what she had found.

14  Q    And did she explain to you what she had viewed depicted

15  a boy between what she --

16        MR. O'CONNOR:  Judge, I'm going to object.  One, the

17  prosecutor is leading.  Two, his conversation with his wife is

18  hearsay, out-of-court statement offered in court for the truth

19  of the matter.

20        THE COURT:  Leading sustained.  The second part is

21  overruled.  Can you just ask him to describe the conversation.

22        MS. MOORE:  Sure.

23  Q    (BY MS. MOORE) Could you describe what image your wife

24  saw or images.

25  A    Yes.  I believe she explained it was kind of like anime,

                                59

1    I guess, like a cartoon, and that one frame or so depicted a

2    young male.  I don't know -- I don't have the report, but

3    around fivish or so, a young child, with a female adult, and I

4    believe doing some sex acts and in the course of that would be

5    calling her mommy.  So -- and something like that really upset

6    her more.

7    Q    And if I -- I'm referring to your police report.  If the

8    report said depicted what she thought was a boy between six to

9    ten years old, does that sound --

10   A    Yeah, okay, yeah.

11   Q    Does that sound fair?

12   A    A child, yes.

13   Q    So based on that, you filed a police report?

14   A    Yes.

15   Q    And did you contact or attempt to contact any detective?

16   A    Yes.  I think a friend of mine that I went through the

17   academy with works the vice unit and I contacted him.

18   Q    After you completed your police report, does that get

19   sent to then a detective unit?

20   A    Yes.  For -- then they transfer it over to whoever's

21   going to take the case, and then they start investigating it.

22   Q    And other than filing the police report, did you have

23   anything else to do with this case?

24   A    No.

25           MS. MOORE:  That's all the questions I have, Your

                                60

1    Honor.

    2              MR. O'CONNOR:  No questions.  Thank you.

    3              THE COURT:  May this witness be released?

    4              MR. O'CONNOR:  Yes, sir.

    5              THE COURT:  Thank you, sir.

    6              THE WITNESS:  Thank you, sir.

    7                  (Witness excused.)

    8              MS. MOORE:  Your Honor, the government calls

    9    Geraldine Haile.

   10              THE COURT:  Ms. Haile, if you could come all the way

   11    to the front here.

   12    GERALDINE HAILE, being duly sworn by the courtroom deputy,

   13    testified:

   14    DIRECT EXAMINATION BY MS. MOORE:

   15    Q     Please state your name for the record.

   16    A     Geraldine Haile.

   17    Q     Can you spell your first and last name, please.

   18    A     First name is G-e-r-a-l-d-i-n-e.  My last name is

   19    spelled H-a-i-l-e.

   20    Q     And, Ms. Haile, where are you employed?

   21    A     The Mid-Continent Public Library, Blue Ridge branch.

   22    Q     How long have you been employed at the Blue Ridge

   23    branch?

   24    A     A little more than 18 years.

   25    Q     What are your duties there at the branch?

                              61

1   A    I'm the branch manager; so I hire and fire staff.  I

2   make sure that the branch is running correctly.  I delegate

3   duties to people who order supplies and work the desk, manage

4   the procedures that we have.

5   Q    Can you tell us a little bit about the computers in your

6   library and how they're used by the community and how people

7   are able to access the computers.

8   A    We have 24 computers at four computer pods.  We have

9   three express computers toward the front of the building, but

10  the ones that are most used are the 24 computers that are on

11  the northeast side of our branch.  The public uses them for

12  just about anything, typing documents, applying for jobs,

13  uploading resumes.  A lot of people are on Facebook.  They use

14  them for whatever you would use your home computer for.

15       There are a lot of people that print at our branch.

16  We -- I think we print more things at the Blue Ridge branch

17  than any other branch in the system.

18  Q    And are people able to essentially access any site on

19  the Internet on those computers?

20  A    If they have unfiltered access, then they have access to

21  most of the things on the Internet, I believe.

22  Q    So explain who has filtered access.

23  A    Anyone under 18.  Well, when you sign on to the

24  computer, you use your library card, which has a unique

25  number, and your pin is your date of birth.  And so people

                              62

1   type in their card number, their date of birth, and if they

2   are under 18 years of age, they don't have a choice.  They

3   have filtered access.  Anyone else 18 and over when they put

4   in their library card number and their date of birth, then the

5   computer gives them the choice of filtered or unfiltered

6   access.

7   Q    And so with filtered access, what things can't you see

8   or can't you do?

9   A    With filtered access, I believe there are many stop

10  words that are built into our computer system that would

11  prevent people from going to certain sites, some of them even

12  academic sites.  If you use certain words, you wouldn't be

13  able to go there.

14  Q    And unfiltered access means?

15  A    I believe there's still some stop words, but not as many

16  in that, again, people can go to many different sites.

17  Q    So on July 11th of 2013, did you receive notice that

18  someone had inappropriately used a computer there at the Blue

19  Ridge branch?

20  A    If you mean July 11th, 2017 --

21  Q    Oh, what did I say?

22  A    You said 2013.  That's okay.

23  Q    I don't know why I said that.  Thank you.

24  A    I just want to make sure I'm testifying to the right

25  date.

                              63

1        I had gone to a meeting at our headquarters, and

2    when I came back in the late afternoon, I was told that

3    someone had printed out objectionable images.

4    Q    Did you view those images?

5    A    I looked at about five or six pages.

6    Q    In any of those images, did you -- well, tell us what

7    you viewed -- what you saw in those images.

8    A    What I saw were some color printouts that indicated to

9    me there were adults and children engaged in sexual activity.

10        MR. O'CONNOR:  Judge, I would have the same

11   objection.

12        THE COURT:  Noted.

13        MR. O'CONNOR:  Thank you, sir.

14   Q    (BY MS. MOORE) So what did you do with all of those

15   images then?

16   A    I took them away from the desk.  I took them to my

17   office.  I counted them and I put them in an envelope.  And

18   the next day I took them to our headquarters so that my boss,

19   who is an associate director for public services, and her

20   boss, who is the customer experience officer, could look at

21   them and decide what they thought about them, and then what

22   they told me to do was take them to the police department and

23   to file a police report.

24   Q    And did you do that?

25   A    I did that.

                              64

1    Q    Do you know what date you went to the police department?

2    A    I went on July 13th.

3    Q    And what police department did you go to?

4    A    I went to the South Patrol Office of the Kansas City

5    Police Department.

6    Q    When you were at the South Patrol Division, did you meet

7    with an officer?

8    A    I met with officer, I believe, Joe Miller, and he took a

9    look at the -- a brief look at the pictures that I recall and

10   took a report from me.

11   Q    And did you give him all of the images that the library

12   was in possession of?

13   A    Yes.

14   Q    After providing the Kansas City, Missouri, Police

15   Department with all the images, did you do anything else in

16   relation to further investigation or anything of that nature?

17   A    I let Officer Miller know that the library operates

18   under privacy laws set by the state of Missouri and that if

19   they wanted to investigate further, they could do that by

20   providing the correct court order or subpoena for the records.

21   But I believe that's all that I did.

22   Q    And you gave him all of the images?

23   A    I gave him all --

24   Q    That were printed out that is?

25   A    That is correct.

65

1          MS. MOORE:  Thank you very much.  I have no further

2     questions of this witness.

3          MR. O'CONNOR:  No questions.  Thank you.

4          THE COURT:  May this witness be excused?

5          MS. MOORE:  Yes, Your Honor.

6          MR. O'CONNOR:  Yes, Your Honor.

7          THE COURT:  Thank you.

8                    (Witness excused.)

9          MS. MOORE:  Your Honor, the government calls Police

10    Officer Joe Miller.

11    JOSEPH MILLER, being duly sworn by the courtroom deputy,

12    testified:

13    DIRECT EXAMINATION BY MS. MOORE:

14    Q    Please state your name for the record.

15    A    Joseph Miller.

16    Q    Where are you employed?

17    A    With the Kansas City, Missouri, Police Department South

18    Patrol.

19    Q    How long have you been employed with the Kansas City,

20    Missouri, Police Department?

21    A    Approximately eight years.

22    Q    What are your duties with the police department?

23    A    I'm a patrol officer where I handle 911 calls.

24    Q    On July 13th of 2017, did you receive a 911 call to

25    report to the station?

                              66

1  A    Yes.

2  Q    And tell us how that works.  Why would you be dispatched

3  to -- back to the station?

4  A    There's certain -- if, say, a citizen comes in and wants

5  to make a police report, if it's a report that a desk clerk

6  cannot take like if it's not an accident or a stealing, an

7  officer has to come take the report.  So we go meet the

8  citizen at the station.

9  Q    Is that then what you did on July 13th, 2017?

10  A    Yes.

11  Q    Who did you meet with?

12  A    It was a Ms. Haile.  I believe she was the supervisor at

13  Mid-Continent Library.

14  Q    And that's the Blue Ridge branch library; is that

15  correct?

16  A    Yes.

17  Q    Is that located in Kansas City, Missouri?

18  A    Yes.

19  Q    When you went to the station and met with Ms. Haile,

20  what did she tell you?

21  A    She said that the day before one of her employees had

22  contacted her and said one of the patrons at the library had

23  came in and was working on one of the computers and printed

24  off some photos or some pictures on one of the copiers, color

25  copiers, that the citizen had came up, took the copies off the

67

1   printer and left and that she noticed that it was out of

2   toner.  She changed the toner and more copies came out.  She

3   picked them up and looked at them and saw that they were not

4   appropriate pictures.  So she contacted her supervisor, which

5   was Ms. Haile, and Ms. Haile had brought the pictures to the

6   station to file a report.

7   Q    Okay.  When she brought the pictures to the station to

8   file a report, did you take a report?

9   A    Yes.

10  Q    And did you recover the images?

11  A    Yes.

12  Q    I'm going to show you just for identification

13  purposes --

14          MS. MOORE:  If I may approach.

15  Q    (BY MS. MOORE) -- Government's Exhibit No. 2, and if you

16  could tell us what that is.

17  A    This is the envelope that I recovered the copies of the

18  photos that she brought in.  These are my initials, my serial

19  number, the date, and the case report number.

20  Q    And then if you will just look inside.  We won't publish

21  these to the jury yet, Your Honor, but are these in the same

22  or substantially the same condition as when you recovered

23  them?

24  A    Yes, uh-huh.

25  Q    And would you describe it as color copy images?

                            68

1    A    Yes.

2    Q    All right.  Thank you very much.

3         After recovering the images from Ms. Haile, did you

4    submit a police report?

5    A    Yes.

6    Q    Does that then go to a detective unit for investigation?

7    A    Correct.

8    Q    Did you do anything then related to this case?

9    A    No.

10        MS. MOORE:  All right.  That's all the questions I

11   have with this witness, Your Honor.

12        MR. O'CONNOR:  No questions.  Thank you, Officer.

13        THE COURT:  This officer may be released?

14        MS. MOORE:  Yes.  Thank you, Your Honor.

15        MR. O'CONNOR:  Yes.

16             (Witness excused.)

17        MS. MOORE:  May we approach?

18        THE COURT:  Yes.

19        (Counsel approached the bench and the following

20   proceedings were had:)

21        MS. MOORE:  So I really just have two more

22   witnesses, and these are the witnesses I would probably offer

23   the images through to the jury.  So just wanted to let you

24   know that.  I don't know if you had a chance to look at all

25   the images I intend to offer, if you want to make an

                              69

```
 1   objection, just a general objection, if you want to take a
 2   break.
 3              THE COURT:  How about we take a break.
 4          (The proceedings returned to open court.)
 5              THE COURT:  Ladies and gentlemen of the jury, this
 6   is a good time for a break.  We'll take about a 15-minute
 7   break.  So we'll have you back in here at 3:20, and at that
 8   time the government will put another witness on.  Do not talk
 9   about this case.  Do not do any research on this case.  See
10   you back at 3:20.
11              (The following proceedings were had out of the
12   presence of the jury:)
13              THE COURT:  We are outside the presence of the jury.
14   I understand the next two witnesses will be the witnesses who
15   will use the exhibits of these anime.  You want to state an
16   objection on the record or --
17              MR. O'CONNOR:  Judge, the objection I would have is
18   the images, I think, Teresa has ferreted these out, but the
19   images that were printed off that the defendant did not
20   receive, he never possessed or received those, although I know
21   there are some that are duplicates that were at his house.
22   I'm only talking about the ones that weren't at his house that
23   printed of which he never possessed or received.  Therefore,
24   under the -- basically the instructions that he never -- the
25   opening element is that he possessed or received those
```

70

documents, he never did because he left the library.

MS. MOORE:  And I guess my response to that would be that he constructively possessed them because he viewed them and printed them.  However, these are the ones from his home, and I do intend to have the next witness identify this pack. This is Exhibit 3 and then --

MR. O'CONNOR:  Is that Hille?

MS. MOORE:  Yes.  And then I will publish a limited number of them to the jury, and then separately we can mark those as 3A, and then those could go back to the jury.

MR. O'CONNOR:  You mean the ones that she got at the house?

MS. MOORE:  Right.

MR. O'CONNOR:  Yes.

MS. MOORE:  Yes.  Does that make sense?

THE COURT:  Yeah.  So I understand at least 3A, those were at his house.  So your objection about possession doesn't relate to Exhibit No. 3; is that correct?

MR. O'CONNOR:  That's correct.

THE COURT:  So then will that objection relate to those recovered from Exhibit No. 2?

MS. MOORE:  And I did not offer 2.  I will have detective -- Task Force Officer Albers testify that he's reviewed the pack from the house and the pack from the library and that there were identical ones to show -- because they

71

1    printed off everything at the library to show in fact he did

2    take some home from the library.  But I'm offering from the

3    pack that were recovered from the house.

4           THE COURT:  So the only ones we're going to be

5    showing are from Exhibit No. 3.  So we know that he physically

6    possessed those, not just possessed them on the computer but

7    he possessed a printed copy.

8           MS. MOORE:  Right.

9           MR. O'CONNOR:  And you're not offering 2?

10          MS. MOORE:  I don't think I'll offer two other than

11   as for Detective Albers to say he compared them, and certainly

12   some that were printed at the library are in this pack.

13         MR. O'CONNOR:  Correct.  As long as you make that

14   distinction so they're not all just the ones that were at the

15   house, were some of the same but not all were.

16         MS. MOORE:  Okay, okay.

17         MR. O'CONNOR:  That's fair.

18         MS. MOORE:  Fair enough.

19         THE COURT:  Yeah.  We'll take a quick break.  Two

20   more witnesses.  And you still think you'll be done today,

21   Ms. Moore?

22         MS. MOORE:  Oh, yes, absolutely.

23         THE COURT:  And still thinking we'll do closing

24   arguments 9 a.m. tomorrow morning?

25         MR. O'CONNOR:  I've got a retired agent coming at

72

1    8:30.

2              THE COURT:  Mr. Buie, I'm going to ask you some

3    questions, please.  Please listen to your lawyer on any

4    objections.

5              But, sir, you heard Mr. O'Connor tell us that you

6    are not going to testify.

7              THE DEFENDANT:  That's correct.

8              THE COURT:  And you've had conversations with

9    Mr. O'Connor about your right not to testify; is that true?

10             THE DEFENDANT:  Yes, Your Honor.

11             THE COURT:  And you understand ultimately it is your

12   decision whether to testify or not to testify; is that true?

13             THE DEFENDANT:  I do, Your Honor.

14             THE COURT:  And you have made the decision based

15   upon advice of counsel to not testify?

16             THE DEFENDANT:  That's correct.

17             THE COURT:  And you understand that's your

18   constitutional right?

19             THE DEFENDANT:  I do, sir.

20             THE COURT:  Ms. Moore, is there anything you'd like

21   me for me to follow up with other than those questions?

22             MS. MOORE:  That's all the government would ask,

23   Your Honor.

24             THE COURT:  And, Mr. O'Connor, anything you'd like?

25             MR. O'CONNOR:  No, Judge.  Thank you.

                              73

```
 1          THE COURT:  We'll see you back in here in about ten

 2   minutes.

 3          (A recess was taken.)

 4          (The following proceedings were had out of the

 5   presence of the jury:)

 6          THE COURT:  Are you ready to bring the jury back in,

 7   Ms. Moore?

 8          MS. MOORE:  Yes, thank you, Your Honor.

 9          THE COURT:  Nothing from Mr. O'Connor?

10          MR. O'CONNOR:  No.

11          THE COURT:  All right.

12          (The following proceedings were had in the presence

13   of the jury:)

14          THE COURT:  Ms. Moore, would you call your next

15   witness, please.

16          MS. MOORE:  Thank you, Your Honor.  The United

17   States calls Sandra Hille.

18          THE COURT:  Officer Hille, if you would please come

19   all the way up here to the front, ma'am.

20   SANDRA HILLE, being duly sworn by the courtroom deputy,

21   testified:

22   DIRECT EXAMINATION BY MS. MOORE:

23   Q    Please state your name for the record.

24   A    Sandra Hille.

25   Q    Are you a federal officer?
```

74

1    A    Yes.

2    Q    How long have you been a federal officer?

3    A    For 12 years.

4    Q    Have you had contact with the defendant in this case,

5    David Buie?

6    A    Yes.

7    Q    And over the last couple of years, have you just had

8    some regular contact with Mr. Buie?

9    A    Yes.

10   Q    I want to -- when did you first meet Mr. Buie?

11   A    I believe it was October 2014.

12   Q    Okay.  And I want to direct your attention to some

13   events that occurred in July of 2017.  On July 12th of 2017,

14   were you notified about an incident with Mr. Buie that had

15   occurred at the Mid-Continent Public Library Blue Ridge

16   branch?

17   A    I was.

18   Q    How were you notified, do you recall?

19   A    I was called by Detective Albers.

20   Q    When you were notified by Detective Albers about the

21   incident at the branch, did you respond to Mr. Buie's home?

22   A    The following day, yes.

23   Q    Do you know when you went out to the home, what time?

24   A    8:30 a.m.

25   Q    And was Mr. Buie there at the home?

```
1    A    He was.

2    Q    Does Mr. Buie -- is he employed?

3    A    I believe he's retired.

4    Q    Do you know what he retired from?

5    A    My best recollection is I believe he was an attorney

6    possibly for the city.

7    Q    What address did you respond to?

8    A    It was on Ewing.  Let me look up the exact address.

9    10719 Ewing, Kansas City, Missouri 64134.

10   Q    Is that in the Western District of Missouri?

11   A    Yes.

12   Q    Did you have face-to-face contact with Mr. Buie there at

13   his home on July 13?

14   A    I did.

15   Q    And did Mr. Buie provide consent to search his home on

16   that date?

17   A    He did.

18   Q    Did you go out to his home with anyone else?

19   A    Yes, another federal officer.

20   Q    During your search of Mr. Buie's home, did you locate

21   some printed images?

22   A    I did.

23   Q    Where were those located?

24   A    On the kitchen table.

25   Q    Did you question Mr. Buie, the defendant, about what had
                              76
```

1    occurred at the library?

2    A    I did.

3    Q    And what did the defendant tell you about libraries?

4    A    He indicated that since March of 2017, he had been

5    frequenting local libraries.  He pointed out four specific

6    libraries.  I believe he said the Bannister, Red Bridge, Blue

7    Ridge, and maybe the Grandview library on at least a weekly

8    basis for the purpose of getting on their Internet capable

9    devices and viewing child porn anime.

10   Q    And when you say child pornography anime, describe what

11   you mean by that.

12   A    Images of children being sexually abused in a cartoonish

13   manner.

14   Q    Did Mr. Buie indicate -- or what did he tell you about

15   actually being able to look at those images on library

16   computers?

17   A    He said he was successful of doing this because he would

18   continually go back on a weekly basis to reengage in the

19   activity.

20   Q    What did Mr. Buie tell you about being able to print

21   images at the library?

22   A    He indicated that sometime in the spring of 2017 -- he

23   had difficulty narrowing it down to an exact date -- that a

24   library patron had complained because they had -- they had

25   observed him viewing the child porn anime, and he also

77

1  admitted that he had attempted to print the material on

2  several occasions.

3  Q    Did Mr. Buie indicate what library he was at when a

4  patron complained about him?

5  A    Yes, he did.

6          THE COURT:  Ma'am, do you need a drink of water?

7          A JUROR:  I'm sorry.

8          THE COURT:  That's okay.  Would you pour a little

9  cup for her, please.  Do you need a cough drop?

10         A JUROR:  I've got some.

11         THE COURT:  Okay.  I have some if you need one.

12         Thank you, ma'am.

13  A    He indicated that that specific occasion occurred at the

14  Red Bridge library branch.

15  Q    (BY MS. MOORE) Did -- when Detective Albers contacted

16  you, that was the -- about the incident at the Blue Ridge

17  branch; is that correct?

18  A    I believe so, yes.

19  Q    Did Mr. Buie tell you that he was asked to leave the Red

20  Bridge branch library?

21  A    In that incident, yes, in the spring of 2017.

22  Q    In the earlier incident?

23  A    Yes.

24  Q    And did Mr. Buie admit that he was viewing child

25  pornography anime or images of children and printing them at

78

1    the library?

2    A    He did.

3    Q    I'm going to show you Government's Exhibit No. 3.

4         MS. MOORE:  If I may approach, Your Honor.

5         THE COURT:  Yes.

6    Q    (BY MS. MOORE) And what is Government's Exhibit 3?

7    A    It is the stack of images that I retrieved from

8    Mr. Buie's residence on July 13th, 2017.

9    Q    Can you just describe generally what the stack contains.

10   A    The stack contains numerous images of in a cartoon

11   manner, an anime manner of minors engaging in sexual activity

12   with adults.

13        MR. O'CONNOR:  Judge, again, same objection.

14        THE COURT:  Noted.

15        MR. O'CONNOR:  Thank you, sir.

16   Q    (BY MS. MOORE) What's the general tenor of -- are there

17   also words on these cartoons?

18   A    There is.

19   Q    What's kind of the general tenor of these images if

20   there is one?

21   A    I mean, in looking at them as a whole, it appears to be

22   images of children, and I'm specifically looking at ones where

23   they appear to be very young engaging in sexual activity with

24   adults.  And it appears to be their parents.

25   Q    Okay.

79

1     A     It would be my opinion they appear to be in a

2     parent-like nature.

3     Q     Do some of the cartoons use words like "mom" and "dad"?

4     A     I'll have to look through here for a second.

5     Q     And that's okay.  You don't have to.  That's fine.  I'll

6     withdraw that question.

7           What did you do -- so after you obtained these

8     images from Mr. Buie's home, what did you do?

9     A     I took possession of them, and I contacted Detective

10    Albers and completed a chain of custody form and gave them

11    over to his custody.

12    Q     Did you go meet Detective Albers?

13    A     I did at FBI headquarters that afternoon -- late that

14    morning.

15    Q     And transferred them to Detective Albers?

16    A     Correct.

17    Q     And you did not keep any for your file?

18    A     No.

19          MS. MOORE:  If I may have one minute, Your Honor.

20          All right.  That's all the questions I have.

21          MR. O'CONNOR:  No questions.  Thank you.

22          THE COURT:  May this witness be released?

23          MR. O'CONNOR:  Yes.

24          THE COURT:  Thank you, ma'am.

25          THE WITNESS:  Thank you.

                              80

1          (Witness excused.)

2          MS. MOORE:  At this time, Your Honor, the government

3     calls -- if I may, sorry -- Task Force Officer David Albers.

4     DAVID ALBERS, being duly sworn by the courtroom deputy,

5     testified:

6     DIRECT EXAMINATION BY MS. MOORE:

7     Q    Please state your name for the record.

8     A    David Albers.

9     Q    Where are you employed?

10    A    I am employed by the Kansas City, Missouri, Police

11    Department, assigned to the FBI Child Exploitation Task Force.

12         MS. MOORE:  I'm sorry.  If I can just have one --

13    thank you.

14    Q    (BY MS. MOORE) So when you're assigned to the FBI Child

15    Exploitation Task Force, where do you actually work out of?

16    A    Out of the FBI offices here in Kansas City.

17    Q    How long have you been with the Kansas City, Missouri,

18    Police Department?

19    A    20 plus years.

20    Q    What unit -- I think you said the child exploitation

21    task force.  How long have you been employed with that unit?

22    A    Little over five years, and prior to that, I was

23    investigating crimes against children for seven years before

24    that.

25    Q    Have you had specialized training in investigating

                              81

1  crimes against children and child exploitation cases?

2  A    Yes.

3  Q    I want to direct your attention to a case that occurred

4  at the Blue Ridge library.  Were you notified about an

5  incident that occurred on the -- at the Blue Ridge library on

6  July 11th, 2017?

7  A    I was.

8  Q    And do you recall how you were notified about that?

9  A    Actually my coworker, the other Kansas City task force

10  officer at the time, had received a call from Officer Atwood

11  relaying the information that he received, and he passed -- my

12  coworker passed that information on to me.

13  Q    That was -- essentially you were able to get the police

14  report that Officer Mitchell filed; is that correct?

15  A    Correct.

16  Q    Is that how things go in the normal course of business,

17  a police officer -- a patrol officer takes the report and then

18  it's assigned to an investigative unit?

19  A    Yes.

20  Q    Is the Blue Ridge public library branch located in the

21  Western District of Missouri?

22  A    It is.

23  Q    And what did you do once you received the information

24  about what had occurred there on July 11th, 2017?

25  A    The information that was passed on to me, I did vaguely

82

1  recognize the name; so then I began trying to figure out why I

2  knew the name.  And --

3  Q    Oh, I'm sorry.  Can we have one minute.

4           (Counsel approached the bench and the following

5  proceedings were had:)

6           MS. MOORE:  I need to stop this line of questioning.

7  This is not where I was going.

8           MR. O'CONNOR:  I understand.

9           MS. MOORE:  So I will just -- if you don't mind if I

10  just lead through this part.

11           MR. O'CONNOR:  Well, I'd have to object for the

12  record.  I mean, I think the bell's kind of already been rung.

13  I'd move for a mistrial.  I believe that him saying he had a

14  familiarity with the name could only bring the jury to believe

15  that there's some other incident involving Mr. Buie.  I don't

16  know how you unring the bell.

17           THE COURT:  The motion for mistrial is denied.  I'll

18  instruct you in front of the jury to ask another question, and

19  you can lead for a series of questions and get us out of this.

20           MS. MOORE:  Uh-huh.

21      (The proceedings returned to open court.)

22           THE COURT:  Ms. Moore, will you ask another

23  question, ma'am.

24           MS. MOORE:  Yes.  Thank you, Your Honor.

25  Q    (BY MS. MOORE) So when you received the information from

                              83

```
 1    the Blue Ridge branch library, did you contact another federal

 2    agent?

 3    A     Yes.

 4    Q     Okay.  And is that Sandra Hille?

 5    A     It is.

 6    Q     And did you provide the information about the July 11th

 7    incident to Sandra Hille?

 8    A     Yes.

 9    Q     After you provided the information to Sandra Hille, did

10    you then meet with her?

11    A     I did.

12    Q     What did Ms. Hille provide to you?

13    A     She provided me the packet of the printouts that she

14    recovered from Mr. Buie's residence when she went out there to

15    contact him.

16    Q     And did you recover the printed images?

17    A     Yes.

18    Q     And I'm going to show you Government's Exhibit No. 3 and

19    just ask you if they are in the same or substantially the same

20    condition as when you recovered the printed images?

21    A     Okay.  They are.

22    Q     Did you review the images that were recovered by Sandra

23    Hille?

24    A     Yes.

25    Q     Did you also review the images that were recovered -- or
```

84

1  were you able to obtain those from the Blue Ridge library

2  branch?

3  A    Yes.

4  Q    That were recovered by Officer Miller, correct?

5  A    Correct.

6  Q    Okay.  Did you compare the images recovered from Sandra

7  Hille with the images that Officer Miller recovered from

8  Geraldine Haile, the library branch manager?

9  A    Yes.

10  Q    Were some of the images the same, identical?

11  A    They were.

12  Q    That were printed at the library and then recovered from

13  Mr. Buie's home?

14  A    Correct.

15  Q    Have you actually gone out to that library and seen the

16  computer area out there?

17  A    Yes.

18  Q    And did you take the photographs that have been admitted

19  into evidence here today?

20  A    Yes.

21  Q    Did you take those photographs when the library was

22  essentially closed so that there were no patrons there?

23  A    Yes.

24  Q    Based on your training and experience, did the images

25  that you recovered, were they transported in interstate

85

1  commerce, that is, by computer?

2  A    Yes.

3        MS. MOORE:  And if I may, Your Honor, I'd like to

4  publish some of the images to the jury.

5        THE COURT:  Yes.

6  Q    (BY MS. MOORE) And let me ask you this before I do that,

7  when you were reviewing the images, did they have a similar

8  theme?

9  A    Yes, they did.

10 Q    And --

11       MS. MOORE:  Do you want to see them before I --

12       MR. O'CONNOR:  I've seen them.  Thank you.

13 Q    (BY MS. MOORE) What was the general theme of the images?

14 A    Basically it portrayed a mother and son sexual

15 relationship.

16 Q    And I'm putting up different images right now that we're

17 showing to the jury.  This particular image, can you just

18 briefly describe what that is.

19 A    I recognize the boy as being a character in a Peter Pan

20 movie, and the text that goes along with that is he's

21 referring to her as mom.

22 Q    Okay.  Do the images depict sexually explicit conduct,

23 that is, sex acts occurring between the characters in the

24 images?

25 A    Yes.

                          86

1  Q    Do the words typically discuss the relationship between

2  a mother and a son?

3  A    Yes.

4  Q    This next image is -- and these are all colored images,

5  cartoons, graphic cartoons would you describe them for the

6  most part?

7  A    I'm sorry.  Say that again.

8  Q    Are the images all, just for the record so we have it

9  clear, printed, colored images of graphic cartoons depicting

10  these different actions?

11  A    Yes.

12  Q    This one's a little different.  Was this -- this one is

13  a black and white image; is that correct?

14  A    Yes.

15  Q    And then these particular images, do -- do most of the

16  images tell some type of, for lack of a better term, story or

17  events that are occurring between the characters?

18  A    They do.

19  Q    And in this particular series of images, again, is this

20  a mother with a son?

21  A    Yes.

22  Q    In this series, is the son essentially going to the

23  mother to hide?  Someone's -- family's looking for him?

24  A    Yes.

25  Q    And do they depict sexual activity between both parties?

87

1    A    They do.

2    Q    And, again, is this depicting -- this picture depict a

3    mother and son?

4    A    Yes.

5    Q    All right.  Thank you.

6         From your training and experience, do some -- well,

7    let me ask you this:  From your training and experience, are

8    images like this available on the Internet?

9    A    They are.

10   Q    Okay.  And are these images something that is -- you can

11   also find other illegal activity on the Internet; is that

12   correct?  Fair statement?

13   A    Yes.

14   Q    Has the Internet become a basis for individuals to

15   obtain essentially what they want, so to speak?

16   A    Yes.

17   Q    Once you recovered these images, what did you do with

18   the case?

19   A    The -- everything was compiled, and then it was

20   submitted to the United States Attorney's Office.

21   Q    To make a determination of filing charges?

22   A    Yes.

23   Q    When -- and let me ask you this if you know this:  Do

24   some -- have you had a lot of training on child exploitation

25   cases and cases on the Internet essentially?

```
 1    A    Yes.

 2    Q    And is it fair to say that some websites are more

 3   difficult to find than others?

 4    A    That would be correct.

 5    Q    And is it also fair to say that sometimes the websites

 6   are more difficult to find than others because, for instance,

 7   the name of the website does not accurately necessarily depict

 8   what the website's there for; is that correct?

 9    A    That's correct.

10    Q    Sometimes websites will have names to essentially avoid

11   law enforcement detection; is that fair to say?

12    A    Yes.

13    Q    And the website is certainly the use of the Internet --

14   website -- when one goes to websites, you're using the

15   Internet, correct?

16    A    Yes.

17    Q    And that's a manner of interstate commerce?

18    A    That's correct.

19         MS. MOORE:  All right.  That's all the questions I

20   have, Your Honor.

21         MR. O'CONNOR:  No questions, Judge.  Thank you.

22         MS. MOORE:  Prior to that, I would move for

23   admission of Government's Exhibit 3A.

24         MR. O'CONNOR:  General objection, Judge.

25         THE COURT:  Objection overruled.  3A is admitted.
```
                                89

1    Sir, you may step down.  Thank you.

2    MS. MOORE:  And at this time the government rests.

3    MR. O'CONNOR:  Can we approach, Judge?

4    THE COURT:  Yes.

5    (Counsel approached the bench and the following

6    proceedings were had:)

7    MR. O'CONNOR:  At this time we file a motion for

8    judgment of acquittal at the close.  I put that on the ECF.  I

9    just wanted to give it today in case you wanted to read it.

10   So she rests.  Then I'm going to rest.  So then I'll bring up

11   another motion just like this that reads the same.

12   THE COURT:  Okay.  I'm going to hold off on ruling

13   on this until we get the jury out of here.  Then you can give

14   me some oral argument on it.

15   MR. O'CONNOR:  Yeah.  Then I'm hoping to put Alvey

16   on and convince you to potentially -- not his testimony but

17   you said preliminarily you're not.

18   THE COURT:  Right, right.

19   (The proceedings returned to open court.)

20   THE COURT:  Mr. O'Connor.

21   MR. O'CONNOR:  At this time, Judge, the defendant

22   rests.

23   THE COURT:  Very good.  Ladies and gentlemen of the

24   jury, that concludes the evidence that you're going to be

25   hearing in this case.  We have some issues to take up.  We're

90

1 going to start back up at 9 a.m., and at that time I will read

2 you some additional jury instructions. You're going to hear

3 closing arguments by both of the attorneys, and then the case

4 will be yours to decide.

5        During this recess and every other recess, do not

6 discuss this case among yourselves or with anyone else,

7 including your family and friends. Do not allow anyone to

8 discuss this case with you or within your hearing. Do not

9 discuss also means do not email, send text messages, blog, or

10 engage in any other form of written, oral, or electronic

11 communication as I've instructed you before.

12        Do not read any newspaper or other written account,

13 watch any televised account, or listen to any radio program on

14 the subject of this trial. Do not conduct any Internet

15 research or consult with any other sources about this case,

16 the people involved in this case, or its general subject

17 matter.

18        You must keep your mind open and free of outside

19 information. Only in this way will you be able to decide the

20 case fairly based solely on the evidence and my instructions

21 on the law. If you decide this case on anything else, you

22 will have done an injustice.

23        It is very important that you follow these

24 instructions. I may not repeat these things to you before

25 every recess. Please keep them in mind until you are

91

1   discharged.

2           We will see you all at nine o'clock in the morning.

3   All rise.

4           (The following proceedings were had out of the

5   presence of the jury:)

6           THE COURT:  You may be seated.  We're outside the

7   presence of the jury at this time.  We've got defendant's

8   motion for judgment of acquittal at the close of the

9   government's evidence.  I'm assuming there's another one for

10  the close of all evidence.

11          MR. O'CONNOR:  Yes, Judge.  I have it here.

12          THE COURT:  Oh, it's right here.  I've got one

13  sitting here for me.

14          MS. MOORE:  Oh, I had the close of all the evidence

15  too.  I don't have the other one.

16          THE COURT:  I've got one of each now.

17          MR. O'CONNOR:  Oh, you do.  Okay, good.  It's the

18  same motion.

19          Judge, we basically would just stand on the motion

20  as written.  I think that the major argument is that the

21  second element, which I don't think the government has proved

22  beyond a reasonable doubt, that particular element, that

23  minors are depicted and they're graphically sexual, relates to

24  whether or not they're 18 years or younger.  They are cartoons

25  subject to interpretation.  I believe the statute is

                              92

1    unconstitutional as written.  I think it's overbroad.

2         I think it is -- it's hard to -- in this case I know

3    he went to a public library.  The items we believe he received

4    were adult pornography which is not illegal and hopefully

5    after our offer of proof in the morning with what we were able

6    to buy at the bookstore, I think it's unclear as to what

7    conduct constitutes the crime in this case.  And so I think

8    it's -- I think that will be our argument.

9         MS. MOORE:  Your Honor, I -- there -- and I'm afraid

10   I don't have any case law at my fingertips to cite, but the

11   issue as to the constitutionality of the statute has been

12   tested on different occasions, and it's been determined that

13   it's not vague or overbroad.  In this particular case the

14   defendant actually obtained images from libraries, from the

15   Internet.  This was not a mere -- he didn't draw something in

16   his home and possess it there.

17        These were images that one of the elements of the

18   statute is that they traveled in interstate commerce or he

19   obtained them from the Internet.  He obtained them at

20   libraries, possessed them at libraries, and then took them

21   back to his home was the testimony.

22        The government believes and asserts that all of the

23   witnesses testified -- the majority of witnesses -- that they

24   were minors depicted in the images, and then the jury was able

25   to see Government's Exhibit 3A, which has been admitted into

93

1  evidence, that depicts minors.  And the testimony from

2  Detective Albers or Task Force Officer Albers is that minors

3  were depicted in those images.  And I guess based -- I'm sorry

4  to interrupt.  I apologize for that.

5        THE COURT:  Interrupting my silence?

6        MS. MOORE:  Interrupting your concentration.  Now

7  that actually the defense has filed this motion, the

8  information or the allegations set forth in the motion

9  actually go, I think, beyond what the defendant indicated at

10  the onset of the trial would be and which I think the court

11  relied on in -- somewhat in the 404(b) ruling.  So I would

12  note that for the record.

13        THE COURT:  I'm going to deny defendant's motion for

14  judgment of acquittal at the close of the government's

15  evidence and defendant's motion for judgment of acquittal at

16  the close of all the evidence.

17        Mr. O'Connor, you've raised some complicated

18  constitutional issues.  As we look through the history of

19  these statutes, the Ashcroft opinion, the Protect Act of 2003,

20  the Child Pornography Prevention Act, all those lay out good

21  legal research.  I'm going to overrule them as well as the

22  unconstitutionally vague as to what the term "minor" means in

23  this case.  While it's fictionalized, animated, character, my

24  review of the animations would be that they are -- do depict a

25  minor and that it's not vague as compared to these images, but

                                   94

the vagueness challenge probably means I'm not supposed to be
looking at the images and determining that -- what the statute
means, determining that it's not vague and that it's not
unconstitutionally overbroad.  So that's my ruling on your two
motions.

Let's talk about the jury instructions.  Does
everybody have those handy?  I now have the citation version,
which hopefully will help us figure out what we're discussing.
We have joint proposed instructions and then, Mr. O'Connor,
you've properly reserved the right to make some objections to
some of those as well.  As we're working through these, I
understand that you want Defendant's Instruction 19, that
there's no burden upon the defendant to prove he is innocent,
to be a separate jury instruction and we would then remove it
from any other portion, and we'll do that so that that's a
separate instruction.

Are there others that you need a ruling on,
Mr. O'Connor?

MR. O'CONNOR:  No, Judge.  Since there's not an
Eighth Circuit instruction -- that basically I think Teresa
did her best to put the instruction together, we would still
object since there isn't an Eighth Circuit instruction.
Absent that, I don't have any other objection.

THE COURT:  And the Eighth Circuit instruction that
is missing is just the ones that are cited as Instruction No.

95

1    20, which she's modified various instructions to come up with

2    the possession of child obscenity.

3            MR. O'CONNOR:  Yes.

4            MS. MOORE:  That's correct, Judge.

5            THE COURT:  I'm overruling that objection.  I will

6    send that on to Judge Knox for his review on the Eighth

7    Circuit jury instruction on the criminal side so that he can

8    potentially put that up for debate and use this little model

9    to get through it.

10            As to No. 19, we'll be including -- since the

11   defendant requests that the language, The fact the defendant

12   did not testify must not be considered by you, that will be

13   included in there as well; is that right, Mr. O'Connor?

14            MR. O'CONNOR:  Yes, sir.

15            THE COURT:  Okay.  We'll be using that modified 17B

16   because the defendant did not testify, which is Eighth Circuit

17   Jury Instruction 3.04.

18            Any other issues with the jury instructions,

19   Ms. Moore?

20            MS. MOORE:  Judge, maybe I misheard or

21   misunderstand.  I thought it was 18 -- did you say 17B or 18B

22   that was going to be modified to remove the burden, there's no

23   burden upon the defendant to testify?

24            THE COURT:  I've got a little flag here on 17B; so I

25   may have misspoke.  I think we're just adding that last

                              96

paragraph in 13.04, 17B about in deciding whether or not to believe a witness. You guys proposed 17A, and 17B is in the alternative. So we just picked 17B because the defendant did not testify, and your 17A was the 3.04 if he did testify.

MS. MOORE: Right. I'm sorry. Thank you. Okay. I think I was jumping ahead of myself. So the government would then -- and on 18B ask that that last paragraph be removed because the defendant is submitting a separate instruction.

MR. O'CONNOR: No objection to that.

MS. MOORE: Okay.

THE COURT: That is what we'll do. We'll have the last paragraph in 18B, which is based on Eighth Circuit Jury Instruction 3.05, to be that paragraph that starts out "the presumption of innocence alone is sufficient." That will be what comes in 18B, and that will be the last paragraph. And then the next jury instruction will be 19, a separate jury instruction, that says, There is no burden upon the defendant to prove that he is innocent.

MS. MOORE: Okay. Thank you, Judge.

THE COURT: Anything else, Ms. Moore?

MS. MOORE: I can't think of anything.

MR. O'CONNOR: How much time for argument?

THE COURT: You pick how long because you're going to be using some time on rebuttal. For a one-day trial, what do you think, sum it up in 30 seconds?

97

1          MS. MOORE:  I think, frankly, 15 minutes should be

2     plenty.

3          THE COURT:  15 minutes for the initial part and how

4     much for rebuttal?

5          MS. MOORE:  I would say 15 minutes total.

6          MR. O'CONNOR:  Yeah.

7          MS. MOORE:  And --

8          THE COURT:  How about we say 15 and 5.  I don't want

9     to -- what I don't want is for you to get up there and start

10    bumbling over, as lawyers tend to do, not you, and then we

11    have to start worrying, Oh, you went 17 minutes.  We'll do 15

12    and 5.  Would you like Tracy to give you any warnings?

13         MS. MOORE:  You want to do a one-minute warning on

14    both sections, that would be very kind.  Thank you.

15         THE COURT:  So you get 20 minutes for your closing,

16    Mr. O'Connor.

17         MR. O'CONNOR:  Yes, sir.

18         THE COURT:  Would you like any warnings, sir?

19         MR. O'CONNOR:  No.  I can't imagine I'm going to

20    talk 20 minutes.  I appreciate it.

21         THE COURT:  We'll give you a one-minute warning just

22    in case you get to 19.

23         MR. O'CONNOR:  Yeah.  Thank you.

24         THE COURT:  Is there anything else from either party

25    on any matter before we reconvene at 8:30 with jury

                                  98

1    instructions in your hand?

2            MR. O'CONNOR:  And I'll have the offer of proof

3    ready to go at 8:30.

4            THE COURT:  Yes, sir.  We can tee it up with them at

5    nine o'clock.

6            MS. MOORE:  All right.  Thank you.

7            THE COURT:  Thank you.

8            (Court adjourned at 4:12 p.m.)

9                    END OF VOLUME I

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
                        99